[Nos. 7662–8–III; 7769–1–III.   Division Three.   December 1, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. ARNOLD JEFFEREY VAHEY, *Appellant.*

*In the Matter of the Personal Restraint of* ARNOLD JEFFEREY VAHEY, *Petitioner.*

*Arnold Jefferey Vahey,* pro se, and *Robert Simeone,* for appellant.

*John G. Wetle, Prosecuting Attorney,* and *Dan Johnson, Deputy,* for respondent.

MUNSON, J.—Arnold J. Vahey appeals his conviction for first degree burglary contending the trial court erred in: (1) refusing to submit to the jury two of his proposed instructions on identity; and (2) denying his motion to dismiss, or alternatively granting a new trial, based on the alleged inconsistency between the jury's verdicts. In his personal restraint petition (PRP), consolidated with this appeal, he contends his prior convictions should not have been considered for purposes of calculating his offender score. We affirm his burglary conviction and dismiss his PRP.

By two separate informations, Mr. Vahey was charged with first degree burglary (RCW 9A.52.020(1)(b)) and second degree assault (RCW 9A.36.020(1)(c)), both occurring on June 16, 1985. He was convicted of the burglary, but

acquitted of the assault.

On June 15, 1985, Wanda Abrahamson attended a wedding reception with her cousin–in–law, Margo Abrahamson. The two women left the reception around 11 p.m. and drove to a tavern. Leaving the tavern around 2 a.m., they drove to Wanda's house where both planned to stay the night. Wanda slept on the living room couch; Margo was in the bedroom.

Sometime during the early morning hours of June 16, an individual entered the bedroom occupied by Margo. She was sleeping on her stomach when she was awakened by an individual who climbed onto the bed and grabbed her in the crotch area. Although too scared to turn over or scream, she twice told the individual to leave. After the individual failed to move, she turned over, grabbed his face by both her hands, and ordered him to leave. She testified she recognized the individual as "Arnie," *i.e.,* Mr. Vahey, whom she knew slightly.

Mr. Vahey got up as if to leave the room. Without making sure he had left the bedroom (much less the house), Margo claimed she rolled back over in an attempt to go back to sleep. However, a few minutes later she heard someone crawling across the floor toward her. She again told the individual to leave. He stood up, said "Jesus Christ" and walked out. Again, Margo did not attempt to verify whether he had left the house; she did not yell to Wanda in the adjacent living room because she "didn't think [she would] have no problem with him." A few minutes after Mr. Vahey left the bedroom, Wanda screamed "Oh my God, Margo." Frightened, Margo did not immediately respond. However, after Wanda screamed a second time, Margo ran to the living room. Upon entering, Margo did not see anyone, but then saw Wanda, bleeding from her head and hand.

Wanda testified she woke up upon being struck in the head. After being struck several times, she raised her hand to ward off the blows. She stated the assailant left the house before Margo opened the bedroom door; Wanda

never saw her attacker.

Following the attack, the two women fled Wanda's house, drove to Wanda's parents' house, and then to the police station, arriving there at approximately 4:55 a.m. Margo told Wanda sometime around that period she believed Mr. Vahey was the perpetrator of the assault.

Wanda was treated by Dr. David A. Ott. He testified Wanda had suffered a depressed skull fracture and a fracture of the hand. According to Dr. Ott, the wounds were inflicted by a blunt, heavy object which had struck her several times.

Several of the investigating law enforcement officers also testified. One of the officers photographed tennis shoe prints found outside Wanda's house. The tennis shoe pattern was later found to be similar to the pattern on the shoes Mr. Vahey was wearing the night of the attack. However, another officer admitted there was a "tremendous" amount of foot traffic in the area where the prints were found. Moreover, the brand of shoe was common. Also, the shoe prints in the photographs measured approximately 12½ inches. Mr. Vahey's shoes were never measured against the actual tracks. He testified he wore size 9½; an officer who measured his tennis shoes testified they were approximately 11½ inches in length.

A hammer was also found near the house. Blood was detected on the hammer. When it was examined at the Washington State Patrol Crime Lab in Spokane, no blood type could be determined. Dr. Ott opined the wounds suffered by Wanda were consistent with her being struck by a hammer.

Additionally, given the blood spatter in the area surrounding the place of attack, the investigating officers believed the perpetrator would likely have blood on his clothing. Mr. Vahey's clothes were examined, but no stains were found. His tennis shoes were also sent to the crime lab for examination. Blood was determined to be present on the right shoe. However, the expert was unable to "type" the blood or even to state whether it was human or animal

in origin. Mr. Vahey stated he often fished and blood could have dripped on his shoes while he cleaned the fish.

The officers also obtained hairs from the sofa where Wanda had been attacked. These hairs were compared with samples obtained from Mr. Vahey. An expert from the crime lab testified the hairs shared some common characteristics. On cross examination, however, the expert admitted that comparison of hairs could not conclusively lead to a positive correlation. He further admitted that although the hairs found at the crime scene were black, they could have come from a person with either blond or red hair.

Michele Samuels, Mr. Vahey's "common law" wife, testified she was with him until approximately 3 or 3:30 a.m. on the night of the attack when they drove to her sister Wendy's house to pick up their baby which Wendy had been baby–sitting. Both Michele and Mr. Vahey had been at the reception attended earlier by Margo and Wanda; Mr. Vahey was quite drunk. Although difficult to tell from the record, apparently Wendy lived within half a mile of Wanda. Ms. Samuels entered her sister's house to retrieve the baby; when she returned to the car, Mr. Vahey was gone. After looking for him for a few minutes, she gave up and took the baby home.

Norman Ford, an in–law of Mr. Vahey, testified he saw Mr. Vahey on a road between Wendy's and Wanda's houses at approximately 4 a.m. He allegedly talked with Mr. Vahey until approximately 4:20. Mr. Ford claimed at that time Mr. Vahey stated he was going to Wendy's house and began walking in that direction.

Wendy, who had gone to sleep after Michele had picked up the child, awakened when Mr. Vahey staggered into her house. She claimed he arrived sometime between 4:30 and 4:40 a.m. He immediately fell asleep on the floor.

Mr. Vahey also testified. He explained that he was quite intoxicated from alcohol and marijuana on the night of the reception. He continued to drink after the reception at a local bar, but had no memory of what happened after leaving the bar. He maintained he did not know Wanda or

where she lived. Although he knew Margo on sight, he stated they were not even casual acquaintances.

At the end of the trial, Mr. Vahey requested the court to submit to the jury two of his instructions relating to identity. The court refused. Following the jury verdict, Mr. Vahey moved for arrest of judgment or alternatively a new trial on the ground the jury verdicts were inconsistent. The motion was denied.

At sentencing, Mr. Vahey admitted to three prior convictions. These prior convictions resulted in an offender score of 3 on the first degree burglary which, in turn, equated to a standard range of 31 to 41 months. The court sentenced Mr. Vahey within that standard range to 36 months. He subsequently challenged his sentence by way of a PRP, which was consolidated with this appeal.

Mr. Vahey initially contends the trial court erred in refusing to give two of his proposed instructions on identification. In refusing to submit these instructions, Judge Stewart reasoned:

> Both of those instructions—and I think that they were submitted as alternate instructions—I felt were adequately covered by the general element instruction. . . . I think the general element instructions therefore give counsel adequate opportunity to fully argue [his] theory of the case. To give a specific instruction with respect to identification, not only is not necessary, but tends to put a greater emphasis on that one element than on other elements, and I think that is not proper.

Although the language of the proposed instructions was taken largely from *State v. Hill,* 83 Wn.2d 558, 560, 520 P.2d 618 (1974) and *State v. Johnson,* 12 Wn. App. 40, 44 n.2, 527 P.2d 1324 (1974), *review denied,* 85 Wn.2d 1001 (1975), those decisions merely state that identity is a question of fact for the jury to determine. They do not purport to recommend "model" instructions, nor do they mandate situations where specific, separate instructions on identity must be given.

Instructions are sufficient if they correctly state the law, are not misleading, and permit the parties to argue

their theories of the case. *State v. Mark,* 94 Wn.2d 520, 526, 618 P.2d 73 (1980); *State v. Robinson,* 44 Wn. App. 611, 623, 722 P.2d 1379, *review denied,* 107 Wn.2d 1009 (1986). Although instructions must allow the parties to argue their theories of the case, a party is not entitled to place his or her argument in the instructions. *State v. Markham,* 40 Wn. App. 75, 87, 697 P.2d 263, *review denied,* 104 Wn.2d 1003 (1985). The number of instructions given on any particular issue is discretionary. *State v. Ellison,* 36 Wn. App. 564, 676 P.2d 531 (1984).

Here, the "to convict" instructions for both the first degree burglary and the second degree assault charges clearly state that the "defendant", *i.e.,* Mr. Vahey, must have done the alleged acts to be found guilty as charged. Thus, it is difficult to see how the jury could conceivably have believed it did not have to "identify this particular Defendant as the perpetrator of the crime" as argued by Mr. Vahey. A requested instruction need not be given if that instruction's subject matter is adequately covered by other instructions. *State v. Passafero,* 79 Wn.2d 495, 487 P.2d 774 (1971); *State v. Etheridge,* 74 Wn.2d 102, 443 P.2d 536 (1968). Instructions 8 and 10, given by the court, clearly informed the jury it had to identify Mr. Vahey as the perpetrator before finding him guilty. Moreover, instruction 2 informed the jury it was required to find "each element of the crime beyond a reasonable doubt." The jury is presumed to follow instructions. *State v. Grisby,* 97 Wn.2d 493, 509, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983). There was no error in refusing to give the proposed instructions.

■ Mr. Vahey next asserts the jury verdict acquitting him of second degree assault is inconsistent with the verdict of guilty on the first degree burglary charge. The general rule is if two offenses arising out of the same transaction are charged in separate counts or informations and one offense includes elements (or acts) necessary to the commission of the other, an acquittal on one charge is

inconsistent with a verdict of guilty on the other. *State v. O'Neil*, 24 Wn.2d 802, 809, 167 P.2d 471 (1946); *State v. Culver*, 36 Wn. App. 524, 527, 675 P.2d 622, *review denied*, 102 Wn.2d 1021 (1984). Notwithstanding, an acquittal on one count is *not* inconsistent with a conviction on the other where the two crimes charged are (1) composed of different elements, and (2) the factual basis (or proof) of each count is not the same. *State v. Fairfax*, 42 Wn.2d 777, 781, 258 P.2d 1212 (1953); *O'Neil*, at 809; *Culver*, at 527; *see also State v. Hawkins*, 70 Wn.2d 697, 714, 425 P.2d 390 (1967), *cert. denied*, 390 U.S. 912 (1968); *State v. Allen*, 66 Wn.2d 641, 643, 404 P.2d 18 (1965); 13 R. Ferguson, Wash. Prac., *Criminal Practice and Procedure* § 4114 (1984 & Supp. 1987).

*O'Neil* presents the archetypal situation where two verdicts are held to be inconsistent. There, defendant O'Neil was accused of assaulting one Frank Spray while in Mr. Spray's living quarters. As a consequence, Mr. O'Neil was charged by separate counts with assault and attempted first degree burglary, one element of which was an assault. The jury returned the verdict of not guilty on the assault charge, but found Mr. O'Neil guilty of attempted first degree burglary. In ruling the verdicts inconsistent, the court stated:

> In the present case, the offenses charged in the two counts of the information were based upon the same transaction. There was no evidence of the commission of an assault by appellant upon Spray, except the latter's testimony narrated above. The jury found by its verdict of not guilty on count No. 1 that appellant did not assault Spray, and thus eliminated from count No. 2 such an assault as an essential aggravating incident of the first–degree burglary therein charged. Since, as stated, there is no substantial evidence to support the only other way in which first–degree burglary is alleged in count No. 2, namely, that appellant was armed with a dangerous weapon, the verdict of guilty of attempted first–degree burglary is not sustained by the evidence.

*O'Neil*, at 810–11.

In this case the instruction defining the elements to convict Mr. Vahey of burglary required the jury to find:

(1) That on or about the 16th day of June, 1985, the defendant entered or remained unlawfully in a dwelling;

(2) That the entering or remaining was with intent to commit a crime against *a person* or property therein;

(3) That in so entering or while in the dwelling or in immediate flight from the dwelling the defendant assaulted *a person* therein; and

(4) that the acts occurred in Stevens County, Washington.

(Italics ours.) Instruction 10, relating to second degree assault, provided in pertinent part:

(1) That on or about the 16th day of June, 1985, the defendant knowingly:
  (a) *assaulted Wanda Abrahamson,* with a weapon or other instrument or thing likely to produce bodily harm; or;
  (b) inflicted grievous bodily harm *upon Wanda Abrahamson* with or without a weapon; and

(2) That the acts occurred in Stevens County, Washington.

If you find from the evidence that element (2) and either (1)(a) or (1)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. Elements (1)(a) and (1)(b) are alternatives and only one need be proved.

(Italics ours.)

Instruction 11 further defined assault as

an intentional touching, striking, or cutting of the person or body of another, regardless of whether any actual physical harm is done to the other person.

An assault is also an intentional act, with unlawful force, which creates in another a reasonable apprehension and fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

The verdict of guilty on the burglary charge is not inconsistent with a verdict of "not guilty" on the second degree assault charge. First, the elements necessary to satisfy the element of assault for purposes of first degree burglary are not the same as those necessary to prove second degree

assault; a simple assault fulfills the assault element for first degree burglary. Instruction 11 informed the jury of the requisite elements necessary to find an assault for the purposes of first degree burglary.

Second, there also exists a factual basis upon which the jury could have acquitted Mr. Vahey on the second degree assault and convicted him of the burglary. The first degree burglary instruction merely required Mr. Vahey to have assaulted "a person" while in Wanda's house.[1] On the other hand, the second degree assault instruction required a finding that Wanda had been assaulted. From the evidence presented and as explained to the jury by the State in its opening argument, Margo was also assaulted. Therefore, the facts permitted the jury to find an assault of Margo for purposes of finding first degree burglary,[2] while simultaneously finding the separate assault of Wanda did not occur.

Thus, while the inference is strong that Wanda was viciously assaulted by the burglar, the jury was charged with the responsibility of determining beyond a reasonable doubt that Mr. Vahey was the perpetrator of the assault on Wanda. She did not see her assailant, nor did Margo. There was no identification of that assailant. While there is circumstantial evidence which would support a conviction on the assault charge, this jury chose not to so find. It apparently required a direct and positive identification. We cannot fault it for its cautious analysis of this evidence. We do not find the verdict inconsistent.

---

[1]The jury was also instructed in instruction 5 that:

"A separate crime is charged in each count. You must decide each count separately as if it were a separate trial. Your verdict on one count should not control your verdict on any other count."

[2]Although the information charging Mr. Vahey with first degree burglary states the assault was committed against Wanda, not "person", the inclusion of Wanda's name was not an element to be proved, but rather mere surplusage. *State v. Hawthorne*, 48 Wn. App. 23, 27, 737 P.2d 717 (1987); *State v. McGary*, 37 Wn. App. 856, 860, 683 P.2d 1125, *review denied*, 102 Wn.2d 1024 (1984). The jury instruction on the burglary charge made specific reference to a person.

Finally, in his PRP, Mr. Vahey contends the court erroneously determined his offender score based on his prior convictions. He maintains, relying on *State v. Ammons,* 105 Wn.2d 175, 713 P.2d 719, 718 P.2d 796, *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 351, 107 S. Ct. 398 (1986), that the convictions should not have been considered because the State failed to (1) prove the convictions by a preponderance of the evidence or (2) demonstrate the convictions' constitutional validity.

The record of the sentencing hearing reveals Mr. Vahey stipulated to the prior convictions. Given this stipulation, there was no need for the State to introduce copies of the convictions or otherwise prove them by a preponderance of the evidence.

Mr. Vahey also challenges the constitutional validity of the guilty pleas which form the basis of his prior convictions. His basis for this challenge is "his recollection that none of the necessary constitutional safeguards that are to be afforded a criminal defendant upon his entering of a plea of guilty were administered to him." His contention is not well taken; *Ammons,* at 187–88, provides

> the State does not have the affirmative burden of proving the constitutional validity of a prior conviction before it can be used in a sentencing proceeding. However, a prior conviction which has been previously determined to have been unconstitutionally obtained or which is constitutionally invalid on its face may not be considered. Constitutionally invalid on its face means a conviction which without further elaboration evidences infirmities of a constitutional magnitude.

(Citations omitted.) *See also State v. Randle,* 47 Wn. App. 232, 238, 734 P.2d 51 (1987). Because Mr. Vahey bears the burden of establishing the unconstitutionality of his guilty pleas, *State v. Davis,* 47 Wn. App. 91, 94, 734 P.2d 500 (1987), his mere allegations of invalidity without more are insufficient.

We affirm his burglary conviction and dismiss his PRP.

McInturff, C.J., and Green, J., concur.

Review denied by Supreme Court March 1, 1988.