# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. RAMIRO FARIAS-GALLEGOS, Appellant. | **FILED**<br>**JUNE 12, 2014**<br>In the Office of the Clerk of Court<br>WA State Court of Appeals, Division III<br><br>No. 30709-3-III<br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND AMENDING OPINION |

The Court has considered appellant's motion for reconsideration and is of the opinion the motion should be denied. Therefore,

IT IS ORDERED the motion for reconsideration of this court's decision of April 24, 2014, is denied.

IT IS FURTHER ORDERED the opinion of April 24, 2014, is amended.

Under ISSUE 8. LFOs, paragraph 3, page 31, it shall read:

The trial court also ordered Farias-Gallegos to pay $1,705 in court costs and $600 for his court-appointed attorney. RCW 10.01.160(3) requires that, "[i]n determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." The trial court found that Farias-Gallegos has the present or future ability to pay these LFOs. Farias-Gallegos did not object to this finding, and cannot challenge it for the first time on appeal. *State v. Duncan*, No. 29916-3-III, slip op. at 7-12 (Wash. Ct. App. Mar. 25, 2014), *petition for review filed*, No. 90188-1 (Wash. April. 30, 2014). Furthermore, we conclude it is premature for this court to address the assigned error for two reasons.

DATED: June 12, 2014

PANEL: Judges Brown, Siddoway, Fearing

FOR THE COURT:

LAUREL H. SIDDOWAY
CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30709-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAMIRO FARIAS-GALLEGOS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury found Ramiro Farias-Gallegos guilty of first degree assault

for shooting at J.M., on August 30, 2011, in Pasco. Farias-Gallegos assigns nine errors

on appeal: (1) the prosecution committed misconduct when it disclosed gang evidence in

discovery, allowed defense counsel to discuss gangs in voir dire, and then elected not to

offer the gang evidence at trial; (2) defense counsel was ineffective when it failed to

move to suppress an out-of-court, show-up identification; (3) the trial court erred when it

instructed the jury that—in order to convict Farias-Gallegos—it must find he possessed a

firearm, but did not specify the firearm's caliber; (4) the trial court erred when it refused

to instruct the jury on accomplice liability; (5) the trial court admitted hearsay in violation

of the confrontation clause when it allowed officers to testify that Farias-Gallegos

"matched" witnesses' descriptions of the shooter; (6) there is insufficient evidence to support his conviction; (7) cumulative errors combined to deny him a fair trial; (8) the trial court failed to inquire into Farias-Gallegos' ability to pay before finding that he has or will have the ability to pay legal financial obligations (LFOs); and (9) the trial court erred when it imposed gang-related community custody conditions unrelated to the circumstances of the crime or the crime itself. We agree the trial court should not have permitted the officers' testimony that Farias-Gallegos matched descriptions given by witnesses, but rule that the error was harmless. We affirm the other rulings of the trial court and affirm the conviction.

## FACTS

On August 30, 2011, at about 2:30 p.m., J.M. drove to work. J.M. stopped at a stop sign and saw no cars or pedestrians. He accelerated his car, but immediately slammed his brakes to avoid hitting two male pedestrians. The two pedestrians angrily approached J.M.'s driver side window. J.M. rolled down the window and the three argued. One of the men, who the State believes to have been Ramiro Farias-Gallegos, said to J.M., "[T]his is my gang. [T]his is my hood and my street." Report of Proceedings (RP) at 116.

The pedestrian who referenced his "gang" pulled a gun and threatened to shoot J.M. J.M. testified at trial, "I didn't care because I've been around guns all my life. I didn't really care." 3 RP at 116. When the pedestrian pointed his gun at J.M., the latter

2

said, "[G]o for it. [T]here are no witnesses around." 3 RP at 116. J.M. added, "[T]hat's fine. Do something. I don't care. It looks small." "If you sh[o]ot me with it I'm pretty sure it [will] hurt a lot but [won't kill] me." 3 RP at 124. Both pedestrians walked away and J.M. drove off. As J.M. drove away, however, one man, who the State believes to have been Farias-Gallegos, fired the gun at J.M. multiple times. J.M. was not hit, but one bullet pierced his driver's side door.

J.M. parked and exited his car to inspect the damage. The two men ran away. J.M. called the police to report the shooting and then drove home. Dispatch told police that one man wore a blue shirt and the other wore blue or gray. J.M. later returned to the scene to speak with police.

Many individuals witnessed the shooting from a distance. The witnesses testified at Farias-Gallegos' trial. The description of the shooter varied from witness to witness. J.O., age 12, saw the argument and one man with a gun. He testified that the gun was silver. J.O. heard four to five gunshots. He was unable to describe the shooter or the shooter's companion.

Myrna Ochoa heard gunfire from her home's front porch, and immediately sought to get her son inside. She saw two pedestrians arguing with a driver. At trial, she testified that, because nearly six months had passed, she could not accurately remember how the two pedestrians looked, but believed that the shooter wore a white shirt.

Elvida Murillo and Lucia Valencia both heard multiple gun shots. Both saw two

3

young men running away towards "B" Street. At trial, Murillo testified her memory was fuzzy, but recalled the two men wore T-shirts. Another witness, Ricardo Castaneda, testified that he saw two men running on "B" Street.

J.M. testified the gun pointed at him was black. He also testified that both pedestrians wore blue jeans, the one who threatened him wore a gray shirt, and the other man wore a white shirt.

Police arrived at the scene after the shooting. J.M. told officers that the gun was semi-automatic. Such a gun would expel shell casings when fired. Police never found a semi-automatic gun. Police removed a bullet from J.M.'s car and found four shell casings at the scene. Officers testified that the shells were either from a .32 or .380 caliber handgun.

Officer Ryan Flanagan wrote in his incident report that the shells were from a .32 caliber handgun. After examining the shells at Farias-Gallegos' trial, Flanagan confirmed the shells were from a .32 caliber handgun. Officer Dean Perry wrote in his incident report that the shells came from a .380 caliber gun. Perry testified he examined the shells at the scene by bending down onto his hands and knees, but did not pick them up. After examining the shells again at trial, Officer Perry testified that they could be either from a .32 or .380 caliber gun.

Police, relying on dispatch and witness descriptions, surrounded the adjacent neighborhoods and searched for the two men in the direction of "B" Street. Officer Dean

Perry passed two men near a known "gang house." One man wore a white shirt and the other wore a gray shirt. When Officer Perry turned his patrol car around to speak with them, the two men ran. Perry radioed news of the fleeing men to his fellow officers. From an overpass, Sergeant Ruben Marquez saw a man wearing a white shirt, but lost track of him after he ran under a tree. Officer Flanagan saw one young man, wearing a gray shirt and blue jeans, running through a field. Flanagan lost sight of the man after the man ran behind a house. On the far side of this house, Officer Michael Wright found a man hiding under a car wearing a gray shirt and blue jeans. Officer Michael Nelson arrested this man. Flanagan confirmed this was the same man he chased through a field. Perry confirmed the arrested man was one of the two who ran from him. The arrested man was Ramiro Farias-Gallegos.

Police arrested Farias-Gallegos one hour after and three blocks from the shooting. Farias-Gallegos explained to officers he hid from them because of an outstanding warrant for an unpaid traffic ticket. There was no such warrant. Police continued to search for the gun and other suspect, but found neither.

Police brought J.M. to the site of the arrest to identify or exclude Farias-Gallegos as the shooter. At trial, Officer Jesse Romero described the process of the identification:

> Basically we took our victim over where they have a detained person. That detained person will then be placed out in front of them, in front of a patrol car where he is not able to see our victim but our victim is able to see the suspect at the time.

3 RP at 78.

Police displayed Farias-Gallegos, but no one else, to J.M. While sitting in Officer Romero's patrol car from "about two cop cars away," J.M. looked at Farias-Gallegos for about a minute before identifying him as the person who threatened him through his open car window. 3 RP at 122. He reflected for a minute, because "I don't want no oe [sic] to go to jail for something they didn't do." 3 RP at 122. According to J.M., at the time of the identification, he was angry, but not afraid. He was upset by the damage to his car, not because he could have been hurt. J.M. also identified Farias-Gallegos in court, during trial, as the person who threatened him with a handgun.

## PROCEDURE

At the beginning of jury selection at trial, the trial court read the second amended information to the pool of potential jurors:

> Ladies and gentlemen, Mr. Farias-Gallegos is charged with the crime of Assault in the First Degree, indicating that on or about August 30, 2011, with intent to inflict great bodily harm upon the person of [J.M.] did assault such person with a firearm, *to wit, a .32 caliber handgun*, and specially alleging that Mr. Farias-Gallegos *or an accomplice* at the time of said crime was armed with a firearm.

1 RP at 3 (emphasis added).

After reading the charge against Farias-Gallegos, the court asked jurors whether they knew officers who might testify at trial. Juror 19 knew Pasco Officer Dave

6

Reardon, stating, "I've met him briefly before, when I worked security. I worked with him dealing with gang issues." 1RP at 10. Reardon did not testify at trial.

Farias-Gallegos claims the State disclosed gang-related evidence in discovery. The record does not support this claim. Regardless, defense counsel believed the State intended to seek a gang-related exceptional sentence. Anticipating the admission of gang-related evidence at trial, defense counsel broached the subject of gangs in voir dire:

> Let's talk about one more hot subject. The subject is, as juror number 19 addressed an opinion or at least made a statement earlier, what about the subject of street gangs? We've all read in the paper and we've all seen on television, street gangs. And that is a subject comes up quite frequently.
> The fact that my client may or may not have been a member of a gang at one time in his life, would that in any way—right now, from the beginning of this case—cause you to be biased against him?

1 RP at 55. One potential juror expressed a belief that members of the same gang may be "guilty by association." 1 RP at 55. Other potential jurors responded that they had no bias against gangs or gang members.

Ramiro Farias-Gallegos complains that police testified, at trial, that they pursued and then arrested him because he "matched" or "fit" the description provided by dispatch and witnesses. The prosecution asked Sergeant Marquez, "Did you see two people that fit the description of your suspects?" 3 RP at 7. Defense objected claiming hearsay. The trial court allowed Marquez to testify about what he observed. Marquez then answered, "Yeah, I saw a male wearing dark jeans and a gray shirt holding a phone up to his head.

That's what I saw." 3 RP at 7.

Prosecution asked Officer Raymond Aparicio, "Did [J.M.] give you a description of the people that had shot at him?" 3 RP at 42. Aparicio responded, "Yes, he did. He said—." 3 RP at 42. Defense interjected a hearsay objection. Prosecution moved on, stating, "We will let [J.M.] testify as to what he said." 3 RP at 42 (some capitalization omitted).

The prosecution asked Officer Michael Nelson, "What was it about that person [found under the car] that led you to believe that he fit the description of one of your suspects[?]" 3 RP at 87. Defense counsel objected arguing that the prosecution was attempting to elicit someone else's description of the suspects through Nelson's testimony. The prosecution responded, "It's not offered for the truth of the matter asserted. It's to explain why [Officer Nelson] did what he did. This gentleman could be under the car working on his car. Officer Nelson needs to explain." 3 RP at 88. The court overruled the objection, but recessed the trial before Officer Nelson answered. When trial reconvened, Nelson never answered the question.

Officer Flanagan testified, "Just as I was finishing everything up at 7th Lane and B Street, Officer Perry said he observed two males matching the suspect description in the area." 3 RP at 24. Officer Wright testified:

> Q: At any time did you locate any of the individuals that fit the description of suspects?

8

A: I did, in the backyard of 1012 South 5th Avenue. We located the subject hiding underneath a car.

3 RP at 69. Officer Romero also testified he located an individual matching the description of the suspect under a car. Farias-Gallegos did not object to the testimony of Wright and Romero.

Officer Dean Perry testified about witnesses' descriptions of the suspects:

Q: Did [J.M.] identify the clothing and or appearance of the two suspects to you?
A: He did and—
Q: I'm asking whether or not he did and not what he said[.]
A: He did.
. . . .
Q: Do you recall how those two individuals were dressed?
A: I believe I have to refer to my report to be sure but I believe one had a white shirt and one had a gray shirt on and they appeared to be dressed like typical gang members in that area.

3 RP at 54-55. Defense counsel objected for lack of foundation.

Outside the jury's presence, the prosecution addressed this objection:

Your Honor, I wanted to go briefly without the jury. I need to make a record. Officer Perry made a reference to the suspect being a gang member but I'm not pursuing a gang aggravator on this case. I think it certainly was a possibility but I'm not going that route. As far as curative instruction if counsel requests one I wouldn't have any objection to that at all.

3 RP at 66. Defense counsel then expressed surprise that the prosecution was not pursuing an exceptional gang sentence.

Without objection, Officer Perry also testified he first saw the two suspects near a known "gang house." J.M. testified Farias-Gallegos told him, "[T]his is my gang, this is my hood and my street" when threatening him. 3 RP at 116.

At the conclusion of trial, the court instructed the jury that it must find beyond a reasonable doubt that Farias-Gallegos assaulted J.M. armed with a firearm, but the court did not instruct the jury it must find Farias-Gallegos was armed with a .32 caliber handgun. The court also declined to instruct the jury on accomplice liability. A jury rendered a guilty verdict for first degree assault for shooting at J.M.

At sentencing, the trial court found Farias-Gallegos has the present or future ability to pay legal financial obligations (LFOs) and imposed $3,405 in LFOs. The trial court sentenced Farias-Gallegos to 168 months' confinement followed by 36 months' community custody. The trial court imposed multiple conditions on defendant's community custody including, "[n]o contact with known gang members" and "[n]o possession of gang paraphernalia including clothing, insignia, medallions, etc." Clerk's Papers (CP) at 17.

## LAW AND ANALYSIS

### ISSUE 1. PROSECUTORIAL MISCONDUCT

Ramiro Farias-Gallegos contends the prosecution committed misconduct by inserting and then downplaying gang evidence into the trial and by allegedly asserting and then withdrawing a criminal gang sentencing enhancement in the case. Farias-

Gallegos claims the State, at the worst, "informed" Farias-Gallegos to prepare to confront evidence of gang activity, or, at the least, misled him into believing it sought a sentencing enhancement. During voir dire, defense counsel questioned jurors about prejudice toward criminal gangs. Farias-Gallegos now argues his counsel questioned the jurors on the subject because of deceit by the State and, further, that the prosecution should have immediately alerted him during voir dire that it did not seek a sentencing enhancement, rather than wait until testimony.

Ramiro Farias-Gallegos runs his arguments together, but we will separate, for analysis, arguments based on gang-related evidence from arguments surrounding the alleged deception that the State sought a gang sentencing enhancement. We address the latter first, because that analysis impacts our rulings with regard to the evidence.

A sentencing court may enhance or reduce a convicted defendant's sentence beyond or below the standard range based upon aggravating or mitigating circumstances. RCW 9.94A.535. One sentencing enhancement arises when "[t]he defendant committed the offense to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." RCW 9.94A.535(3)(s). This enhancement is known as the criminal street gang sentencing enhancement. *State v. Moreno*, 173 Wn. App. 479, 496, 294 P.3d 812 (2013). If the prosecution intends to seek an exceptional sentence, it must give notice to the defense of the underlying aggravating factors. RCW 9.94A.537(1). Typically, the prosecution

11

includes such notice in the charging information. Here, the prosecution provided no such notice in the information or otherwise. Therefore, defense counsel had no justifiable reason to believe that the prosecution would introduce gang evidence for the purpose of seeking an exceptional sentence.

Congruent with its disclosure duties, the prosecution provided defense counsel gang evidence it possessed and a list of witnesses that might testify at trial. It is necessary that the prosecutor resolve doubts regarding disclosure in favor of sharing the evidence with the defense. *State v. Dunivin*, 65 Wn. App. 728, 733-34, 829 P.2d 799 (1992). Disclosing more, rather than less, evidence should be applauded rather than sanctioned. If defendant had confusion resulting from this disclosure as to whether an exceptional sentence was sought, defendant could have raised and resolved the confusion before voir dire.

The record does not confirm Ramiro Farias-Gallegos' assertion that the State informed him to be ready to confront evidence about gangs. The State listed Officer Reardon on its list of witnesses, but the list did not disclose that Reardon would testify on the subject of gangs. Ramiro Farias-Gallegos contends that discovery documents included Reardon's expert opinions regarding gangs. But Farias-Gallegos did not place such documents in the court record.

The prosecution may present gang evidence without seeking a gang-related exceptional sentence. *State v. Embry*, 171 Wn. App. 714, 732, 287 P.3d 648 (2012). The

jury heard evidence from which it might conclude that Ramiro Farias-Gallegos was a member of a gang. The State asked Officer Dean Perry, who responded to J.M.'s call, what steps he took to investigate the allegations of criminal activity. Perry responded that he drove east of the Ochoa house and to where "we know a gang house is." 3 RP at 55. Farias-Gallegos did not object to this testimony. Shortly thereafter, the State asked Perry to describe the dress of the two gentlemen who fled his presence. Perry responded that one wore a white shirt and the other a gray shirt. He then volunteered that they were dressed liked gang members. Farias-Gallegos objected to the answer as lacking a foundation and the court sustained the objection. Farias-Gallegos did not then seek a limiting instruction or a mistrial.

Although the State did not seek a gang sentencing enhancement, gang-related evidence was integral to the trial. The evidence was part of the narrative of the crime. When Farias-Gallegos and his companion approached J.M. in his car, Farias-Gallegos told J.M. that "this is my gang, this is my hood, and my street." 3 RP at 116. The testimony provided an explanation and motivation for Farias-Gallegos' later shooting at J.M. Farias-Gallegos wanted another young man to tread carefully through the former's gang territory. Farias-Gallegos wanted the other youth to know who was boss.

Ramiro Farias-Gallegos argues that the prejudice against him was exacerbated when Officer Reardon testified as to his expertise in gangs. This assertion is incorrect. Reardon never testified. When introducing himself and describing his qualifications,

13

Officer Brad Gregory testified that he had earlier been assigned to the police department gang unit. The testimony was in passing and suggested no connection to the conduct of Farias-Gallegos. The testimony did not prejudice Farias-Gallegos.

Farias-Gallegos argues that evidence of gang affiliation is inflammatory and prejudicial and should scrupulously be avoided. But Farias-Gallegos raised no objection to J.M.'s testimony of the former's comment about his "gang" and "hood" during the oral confrontation. Farias-Gallegos assigns no error on appeal to the introduction of this harmful testimony.

The two cases cited by Farias-Gallegos, *State v. Asaeli*, 150 Wn. App. 543, 208 P.3d 1136 (2009) and *State v. Johnson*, 124 Wn.2d 57, 873 P.2d 514 (1994), help him none. In the former decision, the court held gang evidence to be prejudicial because the State argued a murder was gang-related but presented no testimony of the existence of a gang. In the latter decision, the court held evidence of the defendant's gang membership to be relevant during a sentencing hearing.

Courts are not reluctant to allow evidence of defendant's relationship to a gang when the evidence is relevant to the prosecution. In *State v. Moran*, 119 Wn. App. 197, 81 P.3d 122 (2003), the court allowed the admission of a letter defendant wrote to a friend asking that the friend stop the defendant's girl friend, referenced by degrading gangish terms, from cooperating with the police. Defendant signed the letter, "Your homie," which defendant argued showed a gang connection. In *State v. Cronin*, 142

14

Wn.2d 568, 14 P.3d 752 (2000), the court allowed testimony from the defendant's girl friend that he drove her to a home where gang members, "Viet Boys," lived, since the testimony was part of the narrative behind the crime. In *State v. Campbell*, 78 Wn. App. 813, 901 P.2d 1050 (1995), the court allowed testimony of defendant's involvement in gang activity to show premeditation, motive, and intent. The evidence was probative of the State's theory that the murder resulted from defendant responding with violence to challenges to his status within his gang.

The nub of Ramiro Farias-Gallegos' argument surrounding references to gangs is that the prosecution engaged in misconduct. A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *State v. Miles*, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). A prosecutor's conduct may be improper when he or she "'appeals to jurors' fear and repudiation of criminal groups.'" *State v. Ramos*, 164 Wn. App. 327, 338 n.3, 263 P.3d 1268 (2011) (quoting *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006)).

Ramiro Farias-Gallegos suggests the prosecution engaged in misconduct by failing to alert defense counsel, during voir dire questioning about gang prejudice, that the State did not seek a sentencing enhancement. Farias-Gallegos cites no authority to support this contention. The State had no reason to warn or stop defense counsel from asking voir dire questions about gangs. Given that gang evidence was admitted at trial and relevant

to the case, defense counsel properly asked about bias among potential jurors.

ISSUE 2. INEFFECTIVE ASSISTANCE OF COUNSEL

Ramiro Farias-Gallegos argues his trial counsel provided ineffective assistance of counsel when he failed to seek suppression of the identification by J.M. shortly after Farias-Gallegos' seizure. Farias-Gallegos emphasizes that J.M. saw him briefly and then described his assailant to dispatch as wearing a blue shirt and baggy pants, but he wore a gray shirt and jeans at the show-up identification. J.M. further showed a lack of attention to detail by testifying that Farias-Gallegos came from a house for the show-up when, in fact, Farias-Gallegos came from a patrol car. According to Farias-Gallegos, there was no justification for not trying to suppress the show-up identification. Thus, his counsel was ineffective by not trying. Moreover, the trial court would have granted the motion to suppress, so counsel's error resulted in prejudice.

Appellate courts strongly presume trial counsel was effective. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To prevail on an ineffective assistance claim, appellant must show his attorney was not functioning as counsel as guaranteed by the Sixth Amendment. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 400-01, 972 P.2d 1250 (1999) (quoting *Strickland v. Wash.*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Farias-Gallegos must show:

> (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation

16

prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*McFarland*, 127 Wn.2d at 334-35; *Strickland*, 466 U.S. at 687. If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

We address the underlying law of identifications before discussing whether counsel's assistance was ineffective. If an identification procedure is both suggestive and likely to give rise to a substantial risk of misidentification, the resulting identification is inadmissible. *State v. Hilliard*, 89 Wn.2d 430, 438, 573 P.2d 22 (1977); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). A court must first determine whether the identification procedure is suggestive, unduly calling attention to one individual over others. *State v. Kinard*, 109 Wn. App. 428, 433, 36 P.3d 573 (2001). This is the case here because officers presented only one person to J.M., namely Farias-Gallegos. If suggestive, a court then assesses whether the identification procedure created a substantial likelihood of misidentification—that is, reliability. *Kinard*, 109 Wn. App. at 433. Traditionally, courts consider five factors to determine reliability: "(1) the opportunity of the witness to view the [suspect] at the time [of the crime]; (2) the

witness's [level] of attention; (3) the accuracy of the witness's prior description . . . ; (4) the level of certainty . . . at . . . confrontation; and (5) the time between the [offense] and . . . confrontation." *State v. Barker*, 103 Wn. App. 893, 905, 14 P.3d 863 (2000); *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 357, 34 L. Ed. 2d 401 (1972).

These factors show that J.M.'s identification of Farias-Gallegos was reliable. Farias-Gallegos stood inches from J.M.'s open driver side window while the two argued. J.M. got a clear opportunity to view the suspect at the time of the crime. Once asked to identify Farias-Gallegos as either the shooter or not, he was two car lengths from Farias-Gallegos. J.M. took his time to ensure an accurate identification. J.M. testified he was certain when identifying Farias-Gallegos:

> Q: And you sat there and said I'm not sure?
> A: I said that's him.
> Q: And that took you how long? A minute?
> A: Yeah. I wanted to make sure it was him. I don't want no oe
[sic] to go to jail for something they didn't do.

3 RP at 122. The shooting occurred about 2:30 p.m. and police arrested Farias-Gallegos about 3:30 p.m. J.M. identified him shortly thereafter.

We cannot ask trial counsel his reasons for not seeking to quash testimony of the on-site identification. Thus, we must fathom the universe of possibilities for omitting a motion to exclude. In turn, we must ponder whether one or more possibility is a legitimate reason. We give great deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective. Farias-Gallegos must

18

overcome this presumption and show that his counsel's failure to request the instruction could not have been a legitimate trial tactic to support his claim of ineffective assistance. *Strickland*, 466 U.S. at 689; *State v. Grier*, 171 Wn.2d 17, 20, 246 P.3d 1260 (2011).

Trial counsel had a strategic reason for not seeking to suppress the identification. The assault occurred in a neighborhood with gangs where witnesses could identify the suspects but were afraid to testify against them. When neighbors are familiar with each other, the likelihood of misidentification due to a suggestive procedure is highly unlikely. Under these circumstances, the better defense tactic may be to push for trial and hope that witnesses do not show. A pretrial hearing to quash the evidence gives the State two opportunities to offer evidence for the record. Thus, defense counsel's choice to avoid a pretrial hearing to suppress the show-up identification was strategically sound.

ISSUE 3. JURY INSTRUCTIONS—"TO WIT, A .32 CALIBER HANDGUN"

In its second amended information, the State charged Ramiro Farias-Gallegos with assaulting J.M. "with a firearm to wit: a .32 caliber handgun." CP at 64. Nevertheless, the trial court instructed the jury that, to convict Farias-Gallegos of assault, it must find Farias-Gallegos used a firearm, without mention of the information's reference to a .32 caliber handgun. Farias-Gallegos contends the "broader-than-the-information" instruction is reversible error.

Ramiro Farias-Gallegos forwards broad principles that support his argument. A criminal defendant has a constitutional right to know the charges against him. The State

violates this right when it amends the information after resting its case. *State v. Pelkey*, 109 Wn.2d 484, 487, 745 P.2d 854 (1987); *accord State v. Markle*, 118 Wn.2d 424, 436-37, 823 P.2d 1101 (1992). An "instruction may not be more far-reaching than the charge in the information." *State v. Brown*, 45 Wn. App. 571, 576, 726 P.2d 60 (1986).

Concise rules favor the State. The charging "information must state all the essential statutory and nonstatutory elements of the crimes charged." *State v. Tvedt*, 153 Wn.2d 705, 718, 107 P.3d 728 (2005). But the inclusion of extra language alleging an unnecessary fact in an information is surplusage unless that language is incorporated into the jury instructions. *State v. Crittenden*, 146 Wn. App. 361, 368-69, 189 P.3d 849 (2008) (citing *State v. Rivas*, 49 Wn. App. 677, 683, 746 P.2d 312 (1987)). In other words, where unnecessary language is included in the information, the surplus language is not an element of the crime that must be proved unless it is repeated in the jury instructions. *Tvedt*, 153 Wn.2d at 718; *State v. Miller*, 71 Wn.2d 143, 146, 426 P.2d 986 (1967).

The caliber of gun used by Farias-Gallegos was an unnecessary fact and thus surplusage in the information. The caliber of the gun was not repeated in the jury instruction. Thus, no error lies in the information.

ISSUE 4. JURY INSTRUCTIONS—ACCOMPLICE LIABILITY

Ramiro Farias-Gallegos next contends the trial court erred when it refused to instruct the jury on accomplice liability. This assignment of error arises because the

20

State's information charged that Farias-Gallegos or "an accomplice" was armed with a firearm at the time of the assault. Farias-Gallegos complains the jury may have found him guilty as an accomplice without proper instruction.

During trial, the State did not argue that Farias-Gallegos was an accomplice. Neither the State nor Farias-Gallegos argued that someone else may have been the shooter. Farias-Gallegos argued he was not one of the two pedestrians. Thus, neither the State's nor Farias-Gallegos's theory of the case warranted instructing the jury on accomplice liability. In the end, accomplice liability was not an issue.

A trial court's refusal to issue a requested instruction, when based on the evidence in the case, is reviewed for abuse of discretion. *State v. Reed*, 168 Wn. App. 553, 571, 278 P.3d 203 (2012). A trial court abuses its discretion only where its decision is "manifestly unreasonable or based upon untenable grounds or reasons." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). Jury instructions "are sufficient if they correctly state the law, are not misleading, and permit the parties to argue their theories of the case." *State v. Peerson*, 62 Wn. App. 755, 771, 816 P.2d 43 (1991) (quoting *State v. Vahey*, 49 Wn. App. 767, 772-73, 746 P.2d 327 (1987)). The trial court did not abuse its discretion when it refused to instruct the jury on accomplice liability.

ISSUE 5. HEARSAY—"FIT" THE DESCRIPTION

The State elicited testimony from police officers that Farias-Gallegos "fit" or "matched" witnesses' descriptions of the shooter. While officers did not repeat these

21

witnesses' descriptions verbatim, the jury could infer the content of these descriptions from the officers' more general testimony. Ramiro Farias-Gallegos argues that the officers' testimony was inadmissible hearsay.

The State asked Sergeant Ruben Marquez: Did you see two persons who fit the description of your subjects? Defendant objected and the State responded that it did not seek the statement only what the officer observed. The court allowed the question to be answered. Marquez responded, I saw a male wearing jeans and a gray shirt holding a phone up to his head. Marquez later testified, without objection, that, at the time Farias-Gallegos was detained, he wore the same clothing and haircut, everything fit the "exact description." 3 RP at 10.

Officer Michael Nelson testified, without objection, that, after he joined the search, he found a suspect that matched the description of the suspects. The suspect hid underneath a car. The prosecution then asked Marquez, What was it about that person that led you to believe that he fit the description of one of your suspects? The defense objected on the ground of hearsay. Also, the State had failed to lay a foundation as to who provided the description and the nature of the description. The State explained the question was not asked for the purpose of establishing the truth of the description but to explain the officer's actions. The trial court overruled the objection but recessed the trial for lunch before Officer Marquez answered the question. When court resumed in the

22

afternoon, the State did not repeat the question and Marquez never answered the questions.

Officer Flanagan testified without objection, "Just as I was finishing everything up at 7th Lane and B Street, Officer Perry said he observed two males matching the suspect description in the area." 3 RP at 24. Officer Wright testified:

> Q: At any time did you locate any of the individuals that fit the description of suspects?
> A: I did, in the backyard of 1012 South 5th Avenue. We located the subject hiding underneath a car.

3 RP at 69. Officer Romero, without objection, testified he located an individual matching the description of the suspect under a car.

Officer Dean Perry testified about witnesses' descriptions of the suspects:

> Q: Did [J.M.] identify the clothing and or appearance of the two suspects to you?
> A: He did and—
> Q: I'm asking whether or not he did and not what he said[.]
> A: He did.
> . . . .
> Q: Do you recall how those two individuals were dressed?
> A: I believe I have to refer to my report to be sure but I believe one had a white shirt and one had a gray shirt on and they appeared to be dressed like typical gang members in that area.

3 RP at 54-55. Defense counsel objected for lack of foundation.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802. The

use of hearsay impinges upon a defendant's constitutional right to confront and cross-examine witnesses. *State v. Neal*, 144 Wn.2d 600, 607, 30 P.3d 1255 (2001).

Officers testified that Farias-Gallegos "matched" or "fit" descriptions from witnesses. This was hearsay. The State contends the statements are admissible under the exception in ER 803(a)(3), to show the existing mental condition of the officers by explaining why they arrested Farias-Gallegos. But whether the arrest of Farias-Gallegos was based upon probable cause was not an issue at trial. Whether Farias-Gallegos was guilty was at issue, not whether grounds existed for his arrest. Thus, the testimony remains hearsay.

"A statement is not hearsay if it is used only to show the effect on the listener, *without regard to the truth of the statement.*" *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006) (emphasis added). Out-of-court declarations made to a law enforcement officer may be admitted to demonstrate the officer's or the declarant's state of mind only if their state of mind is relevant to a material issue in the case; otherwise, such declarations are hearsay. *State v. Johnson*, 61 Wn. App. 539, 545, 811 P.2d 687 (1991); *State v. Aaron*, 57 Wn. App. 277, 279-81, 787 P.2d 949 (1990); *State v. Stamm*, 16 Wn. App. 603, 610-12, 559 P.2d 1 (1976). Hearsay is always hearsay, but admissible hearsay, like relevance, depends on the issues in the case.

Several analogous decisions compel a conclusion that the Pasco officers' testimony was inadmissible hearsay. In *State v. Lowrie*, 14 Wn. App. 408, 542 P.2d 128

24

(1975), a detective testified that an informant told him the defendant was involved in the crimes that were the subject of the prosecution. Although the trial court indicated that the testimony was not admitted for the truth of the matter asserted, but only to show that the statement was made and that it in turn resulted in police action, the appellate court held the statement was inadmissible hearsay. The court reasoned that neither the making of the statement by the informant nor the resultant police action was relevant to any issue in the case, except to prove the truth of the matter asserted.

In *Aaron*, 57 Wn. App. at 279-81, an officer testified to an out-of-court declaration made by a police dispatcher. The court reasoned that if the legality of the search and seizure was being challenged, the information available to the officer as the basis for his action would be relevant and material. Nevertheless, the officer's state of mind in reacting to the information he learned from the dispatcher was not an issue and did not make determination of the action more probable or less probable than it would be without the evidence.

In *Johnson*, 61 Wn. App. 539, an officer testified to information from a confidential informant recorded in a search warrant affidavit. The State argued that the lieutenant's testimony was not "offered . . . to prove the truth of the matter asserted,'" ER 801(c), but only to show the officer's state of mind at the time the search warrant was executed. The defendant did not challenge the validity or execution of the search warrant, so the lieutenant's state of mind in executing it was therefore not at issue.

Finally in *Edwards*, 131 Wn. App. at 614-15, a detective testified that he initiated his investigation of the defendant based on the statements of a confidential informant. Thus, the State argued this testimony was not offered to prove the truth of the confidential informant's statement to the detective, but only to explain why the detective began to investigate that particular person. The *Edwards* Court ruled the statement inadmissible hearsay because it was only relevant if offered for its truth, since the detective's motive for starting his investigation "was not an issue in controversy." *Edwards*, 131 Wn. App. at 614.

None of the Pasco officers specified who described the suspects to them. Thus, the declarants are unknown and the specific descriptions are missing. Thus, the State could argue that the officers' testimony was not hearsay since the witnesses' statements were not repeated in court. But, *Johnson*, 61 Wn. App. 539, demands an opposite conclusion.

In *Johnson*, the lieutenant did not testify to the contents of the informant's statement, but trial court allowed testimony, based on the statement, that he had reason to suspect the appellant was involved in drug trafficking. The Washington Court of Appeals noted that cases from other jurisdictions have held that a law enforcement officer's testimony concerning an informant's or eyewitness's statement is inadmissible hearsay even where the officer does not repeat the contents of the statement, but only testifies that the statement led police to investigate or arrest the defendant. *See State v. Irving*, 114

N.J. 427, 555 A.2d 575 (1989); *State v. Hardy*, 354 N.W.2d 21, 23 (Minn. 1984); *Postell v. State*, 398 So. 2d 851, 854 (Fla. Dist. Ct. App.); *Favre v. Henderson*, 464 F.2d 359 (5th Cir. 1972). The *Johnson* court held that where the inescapable inference from the testimony is that a nontestifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, notwithstanding that the actual statements made by the nontestifying witness are not repeated. *Johnson*, 61 Wn. App. at 547.

Since we rule that the officers' testimony was inadmissible, we must next decide if the error in admitting the testimony was harmless or prejudicial. The admission of the evidence raises confrontation clause concerns. *See generally, Crawford v. Wash.*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). This court employs the "overwhelming untainted evidence" test and looks to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Anderson*, 171 Wn.2d at 770.

The following discussion, of whether the evidence is sufficient to support Farias-Gallegos' conviction, subsumes this harmless error analysis by excluding the officers' hearsay statements from the sufficiency of the evidence analysis. Overwhelming evidence supports the conviction, even ignoring the hearsay statements. The hearsay statements added little to the trial, because the officers provided no details as to what

27

witnesses said. J.M. saw Farias-Gallegos up close and indentified him shortly thereafter. Farias-Gallegos fled the scene and was found hiding under a car. He prevaricated to officers by stating he had an outstanding warrant. We conclude the error was harmless.

ISSUE 6. SUFFICIENCY OF EVIDENCE

For a variety of reasons, Ramiro Farias-Gallegos contends the State did not produce sufficient evidence for the jury to find each element of the crime beyond a reasonable doubt. First, J.M. did not see who shot at him because he was driving from the shooter. Second, J.M. testified someone other than Farias-Gallegos wore a white shirt and the gun was black. Ms. Ochoa and her son, the only two people who witnessed the shooting, testified the individual with the gun wore a white shirt. And Jose testified the gun was silver. Third, the information alleged the shooter possessed a .32 caliber handgun. But the State produced no evidence showing that .32 handgun was at the scene. Shell casings found at the scene could have been shot from a .380 even if the casings were .32.

We find there to be sufficient evidence. While neighborhood witnesses hesitated to testify against Farias-Gallegos and were uncertain about the color of the suspect's clothing, J.M. clearly identified Farias-Gallegos as the person who threatened him with a gun just before shots were fired. Commonsense supports a conclusion that, if Farias-Gallegos threatened J.M. with a gun, Farias-Gallegos is the one who immediately thereafter fired the gun. Officer Flanagan testified that the shell casings found at the

scene were for a .32 caliber handgun. To the extent other officers' testimony conflicted with Officer Flanagan's, this court defers to the jury's determinations of credibility.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

The jury found Farias-Gallegos guilty of first degree assault. RCW 9A.36.011(1)(a) reads, "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." The evidence shows Farias-Gallegos shot a firearm toward J.M. in order to harm him.

Overwhelming evidence supports the conviction, even ignoring the hearsay statements. The hearsay statements added little to the trial, because the officers provided no details as to what witnesses said. J.M. saw Farias-Gallegos up close and indentified him shortly thereafter. Farias-Gallegos fled the scene and was found hiding under a car. He prevaricated to officers by stating he had an outstanding warrant. Given this

29

overwhelming evidence, we conclude the admission of the officers' hearsay testimony was harmless.

ISSUE 7. CUMULATIVE ERROR

Under the cumulative error doctrine, a defendant may be entitled to a new trial when the trial court's multiple errors combined to deny the defendant a fair trial. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). The defendant bears the burden of proving an accumulation of error of sufficient magnitude to warrant a new trial. *Lord*, 123 Wn.2d at 332. Farias-Gallegos contends that based upon the many assigned errors, Farias-Gallegos did not receive a fair trial. We have already ruled there was only one error and the error was harmless. It follows there was no cumulative, prejudicial error.

ISSUE 8. LFOs

Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation as part of the sentence. RCW 9.94A.760(1). "Legal financial obligation[s]," defined by RCW 9.94A.030(30), include "restitution to the victim, statutorily imposed crime victims' compensation fees . . . court costs, county or interlocal drug funds, court-appointed attorneys' fees, and costs of defense, fines, and any other financial obligation that is assessed to the offender as a result of a felony conviction."

The trial court ordered Farias-Gallegos to pay a $500 victim assessment pursuant to RCW 7.68.035. This imposition does not require the trial court to consider Farias-Gallegos' ability to pay.

The trial court also ordered Farias-Gallegos to pay $1,705 in court costs. RCW 10.01.160(3) requires that, "[i]n determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." The trial court made no specific finding of Farais-Gallegos' ability to pay the costs. Nonetheless, we conclude it is premature for this court to address the assigned error for two reasons.

First, challenges to LFOs are not properly before this court until the State seeks to enforce them. *State v. Hathaway*, 161 Wn. App. 634, 651, 251 P.3d 253 (2011); *State v. Smits*, 152 Wn. App. 514, 524, 216 P.3d 1097 (2009). Because a person is not an "aggrieved party" under RAP 3.1 "until the State seeks to enforce the award of costs and it is determined that [the defendant] has the ability to pay," appellate review is inappropriate. *State v. Mahone*, 98 Wn. App. 342, 349, 989 P.2d 583 (1999); *see also State v. Blank*, 131 Wn.2d 230, 242, 930 P.2d 1213 (1997). In *State v. Crook*, 146 Wn. App. 24, 27-28, 189 P.3d 811 (2008), this division held that "[m]andatory Department of Corrections deductions from inmate wages for repayment of legal financial obligations are not collection actions by the State requiring inquiry into a defendant's financial status." Thus, "[i]nquiry into the defendant's ability to pay is appropriate only when the

State enforces collection under the judgment or imposes sanctions for nonpayment."

*Crook*, 146 Wn. App. at 27.

Second, when and if the State seeks to collect, Farias-Gallegos may petition the

court for remission under RCW 10.01.160(4), which states:

> A defendant who has been ordered to pay costs and who is not in
> contumacious default in the payment thereof may at any time petition
> the sentencing court for remission of the payment of costs or of any
> unpaid portion thereof. If it appears to the satisfaction of the court
> that payment of the amount due will impose manifest hardship on the
> defendant or the defendant's immediate family, the court may remit all
> or part of the amount due in costs, or modify the method of payment
> under RCW 10.01.170.

The denial or granting of *that motion* would warrant appellate review.

ISSUE 9. COMMUNITY CUSTODY CONDITIONS

Farias Gallegos challenges two conditions for community custody imposed by the

trial court: no contact with known gang members; and no possession of gang

paraphernalia including clothing, insignia, and medallions. He contends the State

presented no evidence that the crime was gang related. Therefore, the court abused its

discretion by imposing these conditions.

The sentencing court has discretion to impose conditions on community custody

that relate to the crime or attendant circumstances. RCW 9.94A.030(10); RCW

9.94A.703(3)(f). In turn, as part of any sentence, the court may impose and enforce

crime related prohibitions and affirmative conditions as provided in chapter 9.94A RCW.

32

RCW 9.94A.505(8). A "crime related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). In turn, "'[c]ircumstance' is defined as '[a]n accompanying or accessory fact.'" *State v. Williams*, 157 Wn. App. 689, 692, 239 P.3d 600 (2010) (quoting BLACK'S LAW DICTIONARY 277 (9th ed. 2009)). "The courts strive to protect freedom of speech, religion and racial equality, but freedom of association may be restricted if reasonably necessary to accomplish the essential needs of the state and public order." *Malone v. United States*, 502 F.2d 554, 556 (9th Cir. 1974). But "[n]o causal link need be established between the condition imposed and the crime committed, so long as the condition relates to the circumstances of the crime." *Williams*, 157 Wn. App. at 691-92 (citing *State v. Llamas-Villa*, 67 Wn. App. 448, 456, 836 P.2d 239 (1992)).

This court reviews sentencing conditions for abuse of discretion. *State v. Crockett*, 118 Wn. App. 853, 856, 78 P.3d 658 (2003). This court "reverse[s] only if the decision is manifestly unreasonable or . . . based on untenable grounds." *Williams*, 157 Wn. App. at 691.

During the altercation with J.M., Farias-Gallegos explained the reason for his aggression, "this is my gang, this is my hood and my street." 3 RP at 116. Farias-Gallegos shot at J.M. for disrespecting him on his turf in accordance with gang culture. Thus, the trial court's condition of avoiding gang members and paraphernalia relate to the

33

30709-3-III
*State v. Farias-Gallegos*

circumstances of Farias-Gallegos shooting at J.M. The trial court's prohibitions are also reasonably necessary to prevent a recurrence of senseless gunfire in a residential neighborhood.

CONCLUSION

We affirm the conviction and sentence imposed on Ramiro Farias-Gallegos, subject to his objection to LFOs if and when the State seeks to enforce the obligations.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____     _____
Brown, J.                            Siddoway, C.J.

34