[No. 16412–1–I.   Division One.   March 18, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES EDWARD RANDLE, *Appellant*.

*Neil M. Fox* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Deborah J. Phillips, Senior Appellate Attorney,* and *Karen Willie, Deputy,* for respondent.

SWANSON, J.—Charles Edward Randle appeals from a judgment and sentence following conviction for first degree burglary. Randle contends the State failed to prove all of the elements of the crime. In addition, Randle challenges the constitutionality of various provisions of the Sentencing Reform Act of 1981 (SRA) by which a juvenile conviction was used to calculate his sentence. We affirm the trial court.

On the afternoon of November 29, 1984, Mildred McKay

observed "three strange boys" at the front door of the Yuen residence in Seattle. McKay, who lived across the street, watched the boys go around the side of the house and then called the police.

The first officer to reach the scene noticed a broken basement window on the east side of the house. He then watched as Reginald Moore crawled out through the window. After the officer placed Moore against the side of the house and frisked him, he observed the defendant come out through the same window. Shortly thereafter, another officer took Herman Talbert into custody as Talbert went out the front door of the house. Talbert and Moore were under 18 years of age; Randle was 19.

All three suspects were driven to a nearby precinct station, where police recovered several items that were subsequently identified as having been taken from the Yuen residence. Police also recovered from Moore a .25 caliber pistol with five bullets in the clip. The gun had been missed during the patdown. All three suspects signed statements admitting to the burglary.

In his statement, which was read at trial, Randle indicated that he had accompanied Moore and Talbert on November 29 "looking for a house to get into." When no one answered the door at the Yuen residence, the three went around the side of the house, where Randle used a hammer to break the window. Randle admitted entering the dwelling and taking some coins and a ring.

By amended information filed February 7, 1985, Randle was charged with first degree burglary. At trial, both Moore and Talbert testified against Randle. Moore stated that he carried the gun in a zippered pocket of his shirt during the burglary. Talbert testified that he did not know about the gun until Moore told him as the three suspects were sitting in the police car.

No witnesses were presented on behalf of the defense. At the conclusion of trial, Randle excepted to the trial court's refusal to give his proposed instructions requiring the jury to find that Randle knew Moore was armed with a deadly

weapon at the time of the crime. The jury found Randle guilty as charged. Based in part on criminal history involving a juvenile second degree burglary conviction, he was sentenced to 24 months in prison.

Randle first contends the State failed to prove that Moore was "armed" for purposes of the first degree burglary statute. Randle argues Moore only "possessed" the gun and, consequently, was not "armed."

In order to convict Randle of first degree burglary, the State had to prove, among other things, that Randle "or another participant in the crime" was "armed with a deadly weapon". RCW 9A.52.020. Because the word "armed" is not defined by statute, it is to be given its ordinary meaning. *State ex rel. Graham v. Northshore Sch. Dist. 417,* 99 Wn.2d 232, 244, 662 P.2d 38 (1983). In the context of penalty–enhancing or substantive criminal statutes, most courts have concluded that "armed" means having a weapon that is "readily available and accessible . . . for either offensive or defensive purposes." *See State v. Sabala,* 44 Wn. App. 444, 448, 723 P.2d 5 (1986) and cases cited therein; *see also State v. Hauck,* 33 Wn. App. 75, 77, 651 P.2d 1092 (1982), *review denied,* 99 Wn.2d 1001 (1983). We have recently reached a similar result in the context of the first degree burglary statute. *See State v. Hall,* 46 Wn. App. 689, 732 P.2d 524 (1987) (defendant "armed with a deadly weapon" when unloaded gun and ammunition were taken in burglary and placed in car trunk).

The test for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia,* 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)). In the instant case, it was undisputed that Moore had a loaded pistol in his shirt pocket while committing the burglary. Under the circumstances, this was sufficient to establish that the gun was easily accessible and readily available for use. *See State v. Sabala, supra* at 448

(sufficient evidence to support finding that gun was easily accessible and readily available for use when gun was located beneath driver's seat of automobile and grip was easily accessible to anyone sitting above it). The gun was not rendered inaccessible merely because the police failed to detect it during the patdown.

Randle's claim that "armed" connotes some intent to use the weapon or that a person is not armed if the weapon is merely concealed, unless it is in a location where one can presume its use is intended, is not supported by authority. In *State v. Eker*, 40 Wn. App. 134, 697 P.2d 273, *review denied*, 104 Wn.2d 1002 (1985), we determined that special verdicts finding the defendant was not "armed with a deadly weapon" but that he was "armed with or in possession of a firearm" were not irreconcilable with the general verdict finding use or threatened use of a deadly weapon. Randle relies upon *Eker* for the proposition that "armed" and "possession" are therefore different. Our analysis in *Eker*, however, involved an attempt to harmonize special and general verdicts and is not dispositive in the instant context. *See State v. Sabala, supra.* One need not necessarily display the weapon, *see State v. Hauck, supra*, or be in actual physical possession, *see State v. Sabala, supra*, in order to be armed. *See also State v. Herkshan*, 105 Ariz. 394, 465 P.2d 587 (1970). As some courts have observed, there often will be no practical difference between being "armed" and being in possession of a deadly weapon. *See, e.g., State v. Anderson*, 178 Conn. 287, 422 A.2d 323 (1979) (not necessary for weapon to be exhibited, displayed, utilized, or referred to in order for one to be considered "armed").

▉ Randle next argues that even if Moore was armed, the jury should have been instructed that the State had to prove that Randle knew Moore was armed. We decline Randle's invitation to reconsider our decision in *State v. Brown*, 36 Wn. App. 549, 676 P.2d 525, *review denied*, 101 Wn.2d 1024 (1984). *See also State v. Davis*, 101 Wn.2d 654, 682 P.2d 883 (1984) (accomplice to robbery need not know

principal armed); *State v. McKim,* 98 Wn.2d 111, 653 P.2d 1040 (1982).

In *Brown,* we held that an accomplice need not know the principal is armed in order to be convicted of first degree burglary. *Brown,* at 556. In reaching this decision, we broke with precedent. *See, e.g., State v. Papadopoulos,* 34 Wn. App. 397, 662 P.2d 59, *review denied,* 100 Wn.2d 1003 (1983) (unarmed defendant cannot be punished for possession of firearm in commission of crime unless defendant has actual or constructive knowledge that coparticipant in crime possessed weapon). Accomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation. *State v. Davis, supra* at 658–59 (quoting *State v. Carothers,* 84 Wn.2d 256, 264, 525 P.2d 731 (1974)). Having agreed to assist in the criminal act, an accomplice runs the risk of having the primary actor exceed the scope of the preplanned activity. *Davis,* at 658. The court in *Davis* recognized the valid legislative interest in discouraging the use of deadly weapons during robberies. *Davis,* at 659. We find this same interest equally applicable to burglaries. Moreover, legislative concern in discouraging the use of weapons also extends to their presence and easy accessibility during the commission of crimes. Whether or not someone was present in the Yuen residence during the burglary or whether or not the gun was displayed does not affect our determination that Moore was armed for purposes of the first degree burglary statute. Consequently, the trial court did not err in refusing Randle's proposed instructions.

Randle next challenges the use of a prior juvenile conviction at sentencing. Most of his contentions are governed by our Supreme Court's recent decision in *State v. Ammons,* 105 Wn.2d 175, 713 P.2d 719, 718 P.2d 796, *cert. denied,* 107 S. Ct. 398 (1986), which was filed after the briefs in this case were prepared. Based on a seriousness score of 7 for first degree burglary and an offender score of 1 for second degree burglary, committed as a juvenile, the standard range of Randle's sentence was 21 to 27 months. Randle

was sentenced to 24 months. For a variety of reasons, Randle contends the court should not have considered the juvenile offense, which would have reduced the presumptive range to 15 to 20 months.

Randle first contends the SRA's requirement that the existence of a conviction for purposes of sentencing be proved by a preponderance of the evidence is a due process violation. *See* former RCW 9.94A.110. The Supreme Court rejected this argument in *Ammons,* analogizing the SRA's criminal history provision to the former parole board's determination of criminal activity in a parole revocation hearing, and held that the SRA's preponderance of the evidence standard satisfied minimal due process requirements. *Ammons,* at 186.

Randle next asserts the State failed to prove Randle's prior convictions even by a preponderance of the evidence standard. At sentencing, the State introduced two certified copies of juvenile orders of disposition bearing the name "Charles Randle." Randle acknowledges the certified copies were sufficient to establish the existence of these prior convictions, but argues that the mere identity of names was insufficient to establish that Randle was the same person and that the State was obligated to present additional independent evidence. However,

> once the State presents an order of judgment and sentence bearing the defendant's name, identity is sufficiently established unless the defendant declares under oath that he is not the person named.

*State v. Binder,* 106 Wn.2d 417, 419, 721 P.2d 967 (1986) (citing *Ammons*). No direct allegation was made at sentencing, nor is one urged on appeal, that Randle is not the same person named in the juvenile orders. Consequently, identity was sufficiently established in the instant case.

Randle next argues the State was required to prove the constitutional validity of the juvenile orders, which were based on guilty pleas. In *Ammons,* the court held that the State does not have the affirmative burden of proving the constitutional validity of a prior conviction for purposes

of sentencing. However, a conviction previously determined to have been unconstitutionally obtained or one that is constitutionally invalid on its face may not be used in a sentencing proceeding. *Ammons.* "Constitutionally invalid on its face" means a conviction that "*without further elaboration* evidences infirmities of a constitutional magnitude." (Italics ours.) *Ammons,* at 188. No such infirmities are alleged in the instant case. Under these circumstances, *Ammons* requires Randle to raise any collateral challenges to the prior conviction through the normal channels for post–conviction relief. *Ammons,* at 188.

Randle next argues the SRA is an unconstitutional violation of the separation of powers doctrine because it limits the trial court's discretion to impose a sentence outside the standard range. The Supreme Court considered and rejected several variations on this argument in *Ammons.* The *Ammons* analysis rests on a rejection of the basic premises of Randle's argument—that the trial court has absolute and independent discretion to sentence and that the SRA is, in effect, a mandatory sentencing scheme. The Supreme Court first noted that the Legislature, not the judiciary, has the authority to determine the sentencing process and that the fixing of legal punishment is a legislative function. *Ammons,* at 180. "The trial court's discretion in sentencing is that which is given by the Legislature." *Ammons,* at 181.

The court also observed that the trial court retains discretion but that the SRA changed the parameters within which discretion could be exercised. *Ammons* (quoting RCW 9.94A.010). Under certain circumstances the trial court may impose a sentence outside the standard range. Noting that similar guidelines had been upheld in connection with the Juvenile Justice Act of 1977, the court held that the Legislature's structuring of sentencing discretion under the SRA "does not infringe upon a judicial power." *Ammons,* at 181.

Under the SRA, a major component in the determination of a sentence is the "offender score," RCW 9.94A.360, which

is based on a defendant's "criminal history." RCW 9.94A-
.030(8)(a). Certain juvenile offenses are also used to calcu-
late the offender score. *See* RCW 9.94A.030(8)(b). The
burglary for which Randle was convicted and sentenced
occurred on November 29, 1984, after the July 1, 1984,
effective date of the SRA. The juvenile offense that was
used to calculate Randle's offender score occurred prior to
the SRA's effective date.

Relying on these circumstances, as well as RCW 13.04-
.240, which provides that an order adjudging a child delin-
quent "shall in no case be deemed a conviction of crime[,]"
Randle contends for the first time on appeal that the use of
pre–SRA juvenile offenses to calculate the sentence for a
post–SRA adult crime violates state and federal ex post
facto provisions. *See* U.S. Const. art. 1, §§ 9, 10; Const. art.
1, § 23. He argues that because the use of juvenile convic-
tions in certain cases to determine adult sentences is now
mandatory, whereas such use was discretionary under pre–
SRA law, the SRA changed the legal consequences of the
prior conduct, criminalizing the juvenile offenses and, in
effect, punishing Randle anew for the prior behavior. We
disagree. .

■■ A law violates ex post facto provisions

> if it aggravates a crime or makes it greater than it was
> when committed; permits imposition of a different or
> more severe punishment than was permissible when the
> crime was committed; or, changes the legal rules to per-
> mit less or different testimony to convict the offender
> than was required when the crime was committed.

*State v. Edwards,* 104 Wn.2d 63, 70–71, 701 P.2d 508
(1985). Two critical elements are necessary for a criminal
law to be ex post facto: it must be retrospective, *i.e.,* apply
to events occurring before its enactment, and it must dis-
advantage the affected offender. *Weaver v. Graham,* 450
U.S. 24, 29, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981); *Addle-
man v. Board of Prison Terms & Paroles,* 107 Wn.2d 503,
730 P.2d 1327 (1986). The critical question in determining
if a law is retrospective is "whether the law changes the

legal consequences of acts completed before its effective date." *Weaver,* at 31.

Randle's ex post facto claims rest on a flawed premise: that the use of juvenile offenses to determine or enhance sentences for subsequent adult crimes constitutes additional punishment for the prior conduct. It is well established, however, that any enhanced penalty in such circumstances is imposed solely for the last crime, even though prior offenses or actions are taken into account. *See, e.g., McDonald v. Massachusetts,* 180 U.S. 311, 45 L. Ed. 542, 21 S. Ct. 389 (1901) (habitual offenders statute imposes punishment only on future crimes); *Chapin v. Rhay,* 59 Wn.2d 459, 367 P.2d 832, *cert. denied,* 370 U.S. 955 (1962) (narcotics act fixing increased punishment for second offense is not ex post facto); *State v. Le Pitre,* 54 Wash. 166, 103 P. 27 (1909).

Ex post facto concerns generally arise when a statute criminalizes actions that were legal when performed or when the punishment for a crime is increased beyond that in effect at the time the crime was committed. In *Weaver v. Graham, supra,* a new statutory provision reducing good time credits was held ex post facto when applied to persons convicted prior to the provision's passage because it reduced an inmate's opportunity to earn early release and, in effect, made the punishment more onerous. *Weaver,* at 35–36. In *Ex parte Mooney,* 26 Wn.2d 243, 173 P.2d 655 (1946), our Supreme Court struck down as ex post facto a sentence based on a law not yet in effect at the time of the crime. In the instant case, Randle was sentenced according to the law in effect at the time of the crime. Similarly, in *Lindsey v. Washington,* 301 U.S. 397, 401, 81 L. Ed. 1182, 57 S. Ct. 797 (1937), *rev'g* 187 Wash. 364, 61 P.2d 293 (1936), the United States Supreme Court held void, as ex post facto, application of a statute making mandatory a sentence that previously had been a maximum. In *Lindsey,* however, unlike the instant case, the statute applied a new punitive standard that was enacted after commission of the current crime but before sentencing. *See also State v.*

*Edwards, supra* (law extending period in which death must occur in order to charge murder held ex post facto when applied to crime occurring prior to enactment); *Johnson v. Morris,* 87 Wn.2d 922, 557 P.2d 1299 (1976) (act extending juvenile court jurisdiction past age 18 ex post facto when applied to person committed only until age 18 under prior law). In each of the cases relied upon by Randle, the focus of ex post facto concern was the effect of a change on the *current crime or sentence.* Randle's argument obscures the fact that he was sentenced for post–SRA adult conduct.

Randle concedes that a statute does not apply retrospectively merely because it draws upon conduct occurring prior to its enactment. *See State v. Malone,* 9 Wn. App. 122, 131, 511 P.2d 67 (habitual traffic offenders act not retrospective even though conviction based in part on traffic offenses occurring prior to act's effective date), *review denied,* 82 Wn.2d 1011 (1973). The crucial question is whether the SRA imposes a more severe penalty for the prior conduct or "merely looks back to that conduct without imposing additional sanctions thereon." *Malone,* at 131. Moreover, the use of juvenile offenses to determine subsequent sentences was permissible prior to the passage of the SRA. In *State v. Dainard,* 85 Wn.2d 624, 537 P.2d 760 (1975), the court upheld the consideration of prior juvenile offenses at a subsequent sentencing despite the existence of RCW 13.04-.240. The mere fact that such use is now mandatory in certain circumstances does not constitute any additional punishment for the prior behavior or attach any additional "stigma" to the juvenile offenses. The constitutionality of the Legislature's decision to change the parameters of the judge's discretion at sentencing has been upheld. *See State v. Ammons, supra.*

Finally, one of the purposes of the ex post facto prohibition is to ensure that legislative acts give fair warning of their effect, permitting individuals to rely on their meaning "until explicitly changed." *Weaver,* at 28–29; *State v. Maldonado,* 176 Mont. 322, 578 P.2d 296 (1978). That purpose has been fulfilled in the instant case. At the time of

Randle's juvenile guilty plea, his criminal history could have been considered at a subsequent sentencing, whether Randle committed another offense as a juvenile or as an adult. On July 1, 1984, when it became effective, the SRA had no impact on Randle's juvenile convictions. As of this date Randle must be charged with notice of the consequences of subsequent criminal conduct. Randle did not come within the purview of the SRA until he committed a subsequent felony. *See State v. Malone, supra* at 131–32. He cannot reasonably contend that application of the SRA to that subsequent felony is unfair.

In summary, because Randle was punished only for conduct occurring after the SRA's effective date, it cannot be said that the act changes the legal consequences or underlying nature of the prior juvenile offenses. The SRA is therefore not retrospective as applied to Randle and there is no ex post facto violation.

In an argument related to his ex post facto claims, Randle next contends that the SRA's use of juvenile offenses to calculate adult sentences either impermissibly criminalizes the juvenile behavior or requires that juveniles now be given the right to a jury trial. *See Pasco v. Mace,* 98 Wn.2d 87, 653 P.2d 618 (1982) (state constitution requires jury trial be afforded for offenses that carry criminal stigma or possible term of imprisonment). In either case, Randle maintains, his juvenile conviction should not have been considered for purposes of sentencing.

Cases in juvenile court are tried without a jury. RCW 13.04.021(2). Although the Juvenile Justice Act of 1977 (RCW 13.40) substantially altered the manner in which juvenile offenders are treated, the act does not require jury trials for juvenile adjudicatory proceedings. *State v. Lawley,* 91 Wn.2d 654, 591 P.2d 772 (1979) (upholding constitutionality of RCW 13.04.021(2)).[1] As we have already

---

[1] We note that our Supreme Court has scheduled argument this term in State v. Schaaf, cause 53189–7, a case that may again address whether a juvenile charged with an offense is constitutionally entitled to a jury trial.

noted, the SRA's use of juvenile criminal history to calculate sentences for adult crimes does not constitute any additional punishment or criminal stigma for the juvenile behavior. Contrary to Randle's assertion, the SRA's treatment of juvenile criminal history is circumscribed and differs significantly from the treatment of prior adult criminal history. *See, e.g.,* RCW 9.94A.030(8)(b) (limiting juvenile criminal history to felonies committed when the juvenile was 15 or older and, for class B and C felonies, younger than 23); RCW 9.94A.330 (certain juvenile convictions receive offender score of one–half); RCW 9.94A.360 (offender score rounded down to nearest whole number).

However, we decline to decide whether the SRA now requires jury trials in juvenile adjudicatory proceedings. The essence of Randle's argument is a collateral attack directed to the validity of the prior conviction for purposes of sentencing. As our Supreme Court made clear in *Ammons,* the sentencing for a subsequent crime is the improper forum for such a challenge. The juvenile conviction is not facially invalid. Randle must therefore seek relief through the normal channels for post–conviction relief. *Ammons,* at 188.

The State has moved to supplement the record on appeal with the presentence report prepared by the Department of Corrections. However, because the record is sufficiently complete to permit a decision without recourse to the presentence report, supplementation is unnecessary. *See* RAP 9.10. The State's motion is therefore denied.

The judgment is affirmed.

GROSSE and PEKELIS, JJ., concur.

Review denied by Supreme Court March 1, 1988.