# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  46287-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| LOUIS MARCEL PATTERSON, | |
| Appellant. | |

BJORGEN, J. — Louis Marcel Patterson appeals from his conviction, following a jury trial, for attempted residential burglary.  Patterson contends that (1) the prosecutor committed flagrant and ill-intentioned misconduct in closing argument by expressing his personal opinion as to Patterson's credibility and guilt, and (2) defense counsel rendered ineffective assistance by failing to object to the prosecutor's remarks during trial.  We reverse and remand.

## FACTS

On a foggy morning in December 2013, Charles Brandenburg, accompanied by his son, brought a load of Brandenburg's belongings to the house into which he was moving, a large house on a secluded lot that had been on the market and vacant for some time.  Upon arrival, they noticed a pickup truck parked at an angle under the garage eave.  Brandenburg saw a man,

later identified as Patterson, on the roof, looking in an upper story window and "jiggl[ing]" the bottom corner of the window. Verbatim Report of Proceedings (VRP) at 73. Brandenburg announced himself, and Patterson "scurried" off the roof of the house and onto the ground. VRP at 72.

Brandenburg, who knew that the owner of the house was considering having the roof inspected, asked if Patterson were a roofer. Patterson replied that he "[had] roofed before," and the two spoke for less than a minute. VRP at 74. Brandenburg became suspicious because he thought Patterson seemed "nervous-ish." VRP at 74. According to Brandenburg, Patterson did not introduce himself, offer any services, give a phone number, or inform Brandenburg about the condition of the roof. Patterson did not have any ladders or tools in the truck and, Brandenburg testified, talked quickly "about everything but the roof." VRP at 75.

While they were talking, Brandenburg saw a woman, later identified as Desiree Westerbee, "slid[e] around the side of the house" and get into Patterson's truck. VRP at 78. Brandenburg thought Westerbee also seemed nervous, and she did not speak to him. Shortly after she got in the truck, Patterson walked to the truck, got in, and drove away.

Brandenburg found muddy footprints leading from the driveway around the side of the house and noticed that someone had moved some items stored outside of the house. Brandenburg also noticed that someone had tampered with one of the doors so that "the latch was not in the door jamb anymore," potentially allowing access to the house, but found no evidence that anyone had entered. VRP at 82. He clearly recalled closing and locking all the doors the previous night, because the owner had warned him about burglaries in the area. After confirming that the house's owner had not arranged for anyone else to be at the house, Brandenburg reported the incident to police.

Cowlitz County Sheriff's Deputy Joseph Reiss investigated the incident and located Patterson, who was driving the same truck, the next day. When Reiss approached the truck in his patrol car, Patterson sped away, taking a series of turns at high speed and heading back the way he had come. Reiss activated his lights and siren and gave chase, and Patterson eventually stopped in the driveway of the mobile home park Reiss had initially observed him leaving. Patterson stated that he turned the truck around because he had forgotten his cigarettes.

Reiss questioned Patterson about the events at Brandenburg's residence, and Patterson admitted he had visited the house with Westerbee and climbed on the roof. Patterson explained that they approached the house for no reason while he was giving Westerbee a ride to "meet some people, pick up a vehicle, or something," and that he decided to climb on the roof to see whether it was new. VRP at 134-36. Patterson claimed to work as a roofer, but identified his employer only as "Dave" and could not provide any contact information other than that Dave lived in the same mobile home park where Patterson was staying. VRP at 140-41.

PROCEDURAL HISTORY

The State charged Patterson with attempted residential burglary. Patterson waived a CrR 3.5 hearing and stipulated that he had been on the roof of the house, was not licensed, invited, or otherwise privileged to be there, had not been hired or contracted to do any work there, and knew he was there unlawfully. Patterson pled not guilty and proceeded to trial.

1.    Trial Testimony

Brandenburg and Reiss testified to the facts as set forth above. Reiss also testified that criminals often target large, vacant houses on secluded lots in order to steal appliances and fixtures. After the court read the stipulation, the State rested.

Patterson called several friends and acquaintances who testified that he did roofing work. Dave Seaman, a former co-employee of Patterson, testified that he lived in the mobile home park and had worked with Patterson on roofing jobs.

Patterson also testified on his own behalf. He began by admitting that he had several convictions for drug crimes and crimes of dishonesty, including theft and forgery. He claimed to have turned his life around, however.

Patterson explained that, on the day in question, he had agreed to give Westerbee, who lived in the area of Brandenburg's house, a ride to her car in Kelso. While they waited for a call from someone that Westerbee told him would provide gas money, she asked if Patterson wanted to "check out the view of houses she knows that was empty," and they ended up at Brandenburg's house. VRP at 187-88, 203. Patterson noticed a "For Sale" sign and, while walking around the house checking out the view, wondered if "maybe they'd have a job for" him. VRP at 189.

According to his testimony, after reparking the truck lengthwise next to the garage, Patterson used it to climb on the roof, hoping that if he discovered a problem, he could call the number on the sign and offer his services. Patterson admitted looking in the window, but denied trying to open it or otherwise enter the house or intending to commit any crime there.

Patterson testified that, shortly after he began inspecting the roof, he noticed Brandenburg had arrived. Patterson described the remainder of the interaction consistently with Brandenburg's account.

On cross-examination, the prosecutor focused on various implausible elements in Patterson's account. The court instructed the jury on second degree criminal trespass as an included offense.

2.      Closing Argument

The State argued in closing that Patterson and Westerbee had gone to Brandenburg's

house to "scop[e] it out, to see how to gain access to it," VRP at 250, and that nothing was

missing because Brandenburg and his son arrived "in the nick of time." VRP at 259. In the

course of this argument, the prosecutor made various remarks using the words "I believe." VRP

at 249-50, 273. These included the following explanation from the prosecutor for why

Patterson's truck was empty:

> [Patterson] was driving a . . . pickup, had no tools. I would suggest that there were
> no tools because he was meeting with [Westerbee] because they were up to no good.
> That, one of the things you heard, Deputy Reiss said, one of the things—while these
> houses have no personal belongings, they have big items that they get broken into
> for a reason. Appliances, metals and stuff, and *that's my—I believe that's why this
> car was emptied out because of the anticipation of the big items that were being
> targeted* for this particular day.

VRP at 248-49 (emphasis added). The prosecutor continued in a similar vein regarding

Patterson's purpose for visiting the house:

> We know they ended up there. We know that he didn't have permission or any
> business being there, none whatsoever. They weren't there to look at the house,
> they weren't there to check to buy a house, they didn't know the owners, they didn't
> know Mr. Brandenburg, they had no permission, nothing, they had no business
> being there whatsoever. What we know is, he was not there for the view. He told
> me that. "I am—I'm not there for the view." He tries to tell me, "I'm there to look
> for a job." *I believe he was there looking for a job, just not a roofing job.* Because
> what we know is, he does a walk around the house. He tells you that.

VRP at 250 (emphasis added). The prosecutor used similar language in addressing Patterson's

potential accomplice liability based on Westerbee's conduct:

> We know they were there together. We know that, at some point, they walked
> around the house together, because that's what he said. At some point, various
> items were moved. At some point, he got on the roof and she . . . was downstairs.
> At some point, he was trying to get in upstairs and she was—*I believe she was
> trying to get in downstairs.* And just as the downstairs door was unlatched, that's
> when Mr. Brandenburg arrived.

5

VRP at 272-73 (emphasis added).

The prosecutor also made statements to the jury using the phrase "I'm assuming." VRP at 254-57, 263. For example, the prosecutor described Westerbee's conduct after Brandenburg arrived on the scene as follows:

> And she's hiding, she's being evasive, she's sneaking around, and she just crawls into the passenger seat. What are you doing in the back of the house? You know, you think, well, okay, I'm looking to buy. You're looking to buy, "Oh, hi. You have a really nice house, can I see it? . . . No, she sneaks in very quickly. *I'm assuming as discreetly as possible*, gets in the passenger seat, makes no contact, doesn't explain why she's in the back, why she's doing that, because at this point, Mr. Brandenburg doesn't know what's going on back there.

VRP at 256-57 (emphasis added). The prosecutor again used the phrase in discussing Reiss's pursuit of Patterson:

> [W]e know he's the driver of the vehicle. We don't know if he's involved with the house on 122, we don't know who he is. So, he agrees to tell him. *I'm assuming he didn't stop because of what we call a guilty conscience.* He knows this is the day after that the police were right behind him with the lights on. He had no choice but to talk. He doesn't know what Deputy Reiss knows, he doesn't know what he doesn't know, but he talks.

VRP at 263 (emphasis added). Defense counsel did not object to any of the prosecutor's remarks.

Patterson's attorney did not address the prosecutor's assumptions or statements of belief in closing argument. Instead, the defense conceded that Patterson committed criminal trespass and offered innocent or alternative explanations for the evidence as to the attempted burglary charge.

The jury found Patterson guilty of attempted residential burglary, and the court entered judgment on the verdict. Patterson appeals.

ANALYSIS

Patterson contends that the prosecutor's statements amounted to prejudicial misconduct, incurable by remedial instruction, and thus require reversal despite defense counsel's failure to object. In the alternative, Patterson contends that his attorney's failure to object to the alleged misconduct denied him the right to the effective assistance of counsel. We first address the prosecutorial misconduct claim, then consider whether defense counsel rendered ineffective assistance.

## I. FLAGRANT AND ILL-INTENTIONED PROSECUTORIAL MISCONDUCT

Patterson contends that the prosecutor's remarks amounted to clear and unmistakable expressions of personal opinion as to Patterson's credibility and guilt. From this, he argues that (1) the remarks prejudiced him because the credibility of his explanation for his presence at the house was the key issue in the trial and (2) "the misconduct was so pervasive that" no remedial instruction could have cured the prejudice because "the prosecutor interjected his opinion repeatedly throughout the argument." Br. of Appellant at 11-12. The State counters that Patterson fails to show that the remarks likely affected the verdict or that a curative instruction would have been futile.

After setting out the standard of review, we first address whether the prosecutor's remarks amounted to prejudicial misconduct. Concluding that they were improper and prejudicial, we then consider whether the misconduct merits reversal despite defense counsel's failure to object.

1. <u>Governing Legal Standards</u>

To prevail on a prosecutorial misconduct claim, a defendant must show that the prosecutor's conduct was both improper and prejudicial "in the context of the record and all of the circumstances of the trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012), *cert. denied*, 2015 WL 4127314 (Oct. 19, 2015). To establish prejudice, the defendant must "show a substantial likelihood that the misconduct affected the jury verdict." *Glasmann*, 175 Wn.2d at 704. A defendant who failed to object at trial must also establish "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704.

A prosecutor enjoys "wide latitude to argue reasonable inferences from the evidence," but "must 'seek convictions based only on probative evidence and sound reason.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). A prosecutor who "throw[s] the prestige of his public office . . . and the expression of his own belief of guilt into the scales against the accused" deprives the defendant of the constitutional right to a fair trial. *Glasmann*, 175 Wn.2d at 703-04 (alteration in original) (quoting *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011)). Similarly, a prosecutor commits misconduct by asserting his personal opinion of the credibility of the witness. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

The *Glasmann* court emphasized that "a prosecutor cannot use his or her position of power and prestige to sway the jury," quoting at length from the commentary to the *American Bar Association Standards for Criminal Justice*:

> The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because

of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office.

175 Wn.2d at 706. The court went on to discuss the "many cases warn[ing] of the need for a prosecutor to avoid expressing a personal opinion of guilt." *Glasmann*, 175 Wn.2d at 706.

2.      Improper Argument

In *State v. McKenzie*, 157 Wn.2d 44, 56, 134 P.3d 221 (2006), a case decided prior to *Glasmann*, our Supreme Court declined to hold that a prosecutor's assertions of the defendant's guilt amounted to misconduct, because they occurred during rebuttal

in responses to defense counsel's repetitive theme [that the defendant was innocent], and in each instance the deputy prosecutor was either rebutting defense counsel's interpretation of the evidence or emphasizing facts supporting the State's theory of the case.

The court thus held that the defendant could not show that the assertions of guilt constituted "a 'clear and unmistakable' expression of the deputy prosecutor's personal opinion, divorced from the evidence." *McKenzie*, 157 Wn.2d at 56-57 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

In contrast, the court in *State v. Case*, 49 Wn.2d 66, 68, 298 P.2d 500 (1956), held the following remarks by the prosecutor to be improper:

I doubt that you haven't already made up your mind. Now, you must have, as human beings. But if you haven't, don't hold it against me, I mean, that is my opinion about what this evidence shows and how clearly this evidence indicates that this girl has been violated.

Our Supreme Court could not "interpret the quoted statement, taken in context, as anything other than an attempt to impress upon the jury the deputy prosecuting attorney's personal belief in the defendant's guilt." *Case*, 49 Wn.2d at 68.

The prosecutor's remarks here at issue fall much closer to *Case* than to *McKenzie*. First, the prosecutor explicitly phrased his remarks as statements of personal belief or assumptions and made them as part of his initial closing remarks, not in rebuttal. Second, as in *Case*, there is no reasonable way to interpret the statements: "that's my—I believe that's why this car was emptied out because of the anticipation of the big items that were being targeted for this particular day," and "I believe he was there looking for a job, just not a roofing job," VRP at 248-50, as anything other than expressions of the prosecutor's personal opinion that Patterson lied to the jury and actually intended to commit a crime in the house, the key issue in the case. In addition, the statements "I'm assuming he didn't stop because of what we call a guilty conscience," VRP at 263, and "he was trying to get in upstairs and . . . I believe she was trying to get in downstairs," VRP at 273, cannot be interpreted as anything other than statements of the prosecutor's personal opinion of guilt.

We agree with Patterson that they amounted to clear and unmistakable expressions of opinion as to credibility and guilt. The remarks therefore amounted to misconduct under the standard articulated in *McKenzie*, 157 Wn.2d at 56-57. Because Patterson did not object, however, the question remains whether they merit reversal. *Glasmann*, 175 Wn.2d at 704.

C.    Flagrant and Ill-Intentioned

The State contends that Patterson fails to show that the misconduct posed a substantial likelihood of affecting the verdict and argues that a curative instruction could have remedied any prejudice. We agree with the latter argument.

As discussed, where the defendant did not object, appellate courts will reverse due to a prosecutor's improper argument only if it amounts to flagrant and ill-intentioned misconduct, incurable by remedial instruction. *Glasmann*, 175 Wn.2d at 704. Such cases require reversal

because "there is, in effect, a mistrial and a new trial is the only and the mandatory remedy." *Case*, 49 Wn.2d at 74.

Our Supreme Court has made clear that "[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The *Glasmann* court further specified, however, that "deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts." 175 Wn.2d at 711. Thus, in considering such claims we should "not decide whether reversal is required by deciding whether . . . the evidence is sufficient" but must instead "focus . . . on the misconduct and its impact, not on the evidence that was properly admitted." *Glasmann* 175 Wn.2d at 711.

In holding that Glasmann had shown a "substantial likelihood that the misconduct affected the jury verdict," the *Glasmann* court relied in part on the fact that the evidence presented and instructions given could have supported convictions for lesser degrees of the charged crimes. 175 Wn.2d at 708. The *Glassman* court found the misconduct at issue there "so pervasive that it could not have been cured by an instruction," noting that "'the cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" 175 Wn.2d at 707 (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *review denied*, 177 Wn.2d 1026 (2013)).

The State denies that the misconduct posed a substantial likelihood of affecting the verdict because "there was substantial evidence for the jury to find the appellant guilty." Br. of Resp't at 21. Our Supreme Court has expressly rejected this argument. *Glassman* 175 Wn.2d at 711. Patterson correctly notes that the credibility of his explanation for his presence on the roof was crucial to his defense. The evidence against him, although indeed substantial, does not

qualify as overwhelming, and is arguably consistent with Patterson having committed only the lesser offense. Given the prestige of his office, the prosecutor's expressions of personal belief as to Patterson's guilt and lack of credibility likely influenced the jurors. We agree with Patterson that under the principles above the misconduct prejudiced him.

Whether a curative instruction could have remedied the prejudice presents a more difficult question. Patterson correctly points out that the prosecutor made similar improper statements throughout his initial closing remarks. Had Patterson timely objected in the first instance, however, and the court given a proper curative instruction, it seems likely that the prosecutor would have stopped phrasing the inferences he wished the jury to make in terms of his personal belief. The jury furthermore, would presumably not have considered such remarks in its deliberations had it received a proper and thorough remedial instruction.

Patterson bears the burden of showing a curative instruction futile. *Glasmann*, 175 Wn.2d at 704. He has not carried that burden. We hold that a timely objection and proper instruction from the court could have remedied the prejudice stemming from the misconduct here. Because Patterson did not object, then, the improper remarks do not merit reversal.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Patterson argues in the alternative that, if a curative instruction could have remedied the prejudice flowing from the prosecutor's improper argument, defense counsel's failure to object amounted to deficient performance that prejudiced his case. Br. of Appellant 12-13. We agree.

Appellate courts review claims of ineffective assistance of counsel de novo, as they present mixed questions of law and fact. *State v. A.N.J.*, 168 Wn.2d 91, 109, 225 P.3d 956 (2010). A defendant who raises an ineffective assistance claim "bears the burden of showing that (1) his counsel's performance fell below an objective standard of reasonableness and, if so,

12

(2) that counsel's poor work prejudiced him." *A.N.J.*, 168 Wn.2d at 109. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Although "there is a strong presumption that defense counsel's conduct is not deficient," that presumption is rebutted if "no conceivable legitimate tactic explain[s] counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

The prosecutor's improper remarks went to the key issue in the case—Patterson's credibility—and "thr[ew] the prestige of his public office . . . and the expression of his own belief of guilt into the scales against the accused." *Case*, 49 Wn.2d at 71. The *Glasmann* court noted that "many cases warn of the need for a prosecutor to avoid expressing a personal opinion of guilt." 175 Wn.2d at 706.

The prosecutor made similar statements of personal belief several times during his argument. Defense counsel made no attempt to somehow exploit the improper remarks to Patterson's advantage, and we can perceive no way in which refraining from any objection to such statements could serve Patterson's interests. Thus, no conceivable legitimate tactic explains the failure of Patterson's attorney to object to the prosecutor's argument. We agree that defense counsel's conduct fell below an objective standard of reasonableness.

For the reasons discussed in part I above, the failure to timely object and obtain a curative instruction from the court also prejudiced Patterson's case. Patterson thus has established both deficient performance and prejudice. Under the case law above, this failure denied him the right to the effective assistance of counsel. The remedy is to reverse the attempted burglary

No. 46287-7-II

conviction and remand for further proceedings. *Reichenbach*, 153 Wn.2d at 137.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

I concur:

JOHANSON, C.J.

Melnick (dissent) — I respectfully disagree with the majority's holding that the prosecutor improperly expressed his personal opinion as to Louis Marcel Patterson's credibility and guilt during closing argument. The prosecutor argued inferences from the evidence admitted at trial. He did not express a personal opinion.[1] However, even if the remarks were improper, there is no prejudice.

Because we review allegations of prosecutorial misconduct during closing argument in light of the entire argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011), the following facts and their connection to the prosecutor's closing argument are especially important to this discussion.

At his trial, Patterson stipulated to the facts that constituted guilt of trespass in the second degree. Patterson argued that he did not intend to commit a crime inside the residence, and thus he was not guilty of attempted residential burglary. Patterson testified as follows:

> [Patterson]. I unloaded all my equipment out of my truck. Not planning on looking at a roofing job, so I—
> [Defense Counsel]. You unloaded it out of your truck where?
> [Patterson]. Yeah—at the Tenant Way house.
> [Defense Counsel]. Oh, down at the—
> [Patterson]. Down—
> [Defense Counsel]. —mobile home park?
> [Patterson]. Yes.
> [Defense Counsel]. And do you—what do you normally have in the truck?
> [Patterson]. Normally, I have a short ladder, and extension ladder that will go up a couple—you know, the big, long ones. And a bucket of tools, my toolboxes, they're all in my diamond-plate box that were in the back of the pickup, and miscellaneous. It depends on if I'm doing plumbing or not, I grab a certain bin. If I'm going to a plumbing job, I'll grab that bin. If I go to a roofing job, I grab my roofing stuff that's laying on the side of the house and load it up.

---

[1] I am aware that the majority is reversing Patterson's conviction based on ineffective assistance of counsel for failing to object; however, I do not believe this issue should be addressed because the prosecutor's arguments were neither improper nor prejudicial.

[Defense Counsel]. So, you started to say you didn't have that stuff with you—

[Patterson]. Correct.

[Defense Counsel]. —on this particular trip?

[Patterson]. I did not. I had just unloaded everything that night to clean up the back of the truck to get prepared for other jobs. And I did not have my equipment with me.

Report of Proceedings (RP) at 189-190. In closing argument, Patterson urged the jury to convict him only of this misdemeanor.

From this evidence, the prosecutor argued, "I believe that's why this car was emptied out because of the anticipation of the big items that were being targeted for this particular day." RP at 249. And, "What we know is, he was not there for the view. He told me that. 'I am—I'm not there for the view.' He tries to tell me, 'I'm there to look for a job.' I believe he was there looking for a job, just not a roofing job. Because what we know is, he does a walk around the house. He tells you that." RP at 250. This argument is based on or deduced from the evidence in the case.

Other evidence at trial included that Charles Brandenburg arrived at the house into which he was moving and saw Patterson on the roof, jiggling a window. Patterson "scurried off the roof" and began talking to Brandenburg. While doing so, he Brandenburg Desiree Westerbee, "slid[e] around the side of the house" and get in the truck. RP at 72, 78. Brandenburg testified that Westerbee seemed nervous. Brandenburg inspected the area and found muddy footprints leading from the driveway around the side of the house. He noticed that someone had moved items stored outside of the house. Brandenburg also discovered that someone had tampered with one of the doors so that "the latch was not in the door jamb anymore," potentially allowing access to the house. RP at 82. He clearly recalled closing and locking all the doors the previous night, because the owner had warned him about burglaries in the area.

From this evidence, the prosecutor argued, "At some point, [Patterson] got on the roof and [Westerbee] . . . was downstairs. At some point, he was trying to get in upstairs and she was—I believe she was trying to get in downstairs. And just as the downstairs door was unlatched, that's when Mr. Brandenburg arrived." RP at 272-273

At the end of the evidence but prior to closing argument, the trial court instructed the jury, in pertinent part, as follows:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits and stipulations. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

RP at 231.

Prosecutorial misconduct in closing argument occurs when a prosecuting attorney expresses personal opinions on the guilt of a defendant, the credibility of a witness, or issues in the case. *State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996); *State v. Dhaliwal*, 150 Wn.2d 559, 577-78, 79 P.3d 432 (2003). We view the challenged statements in context to decide if the prosecutor is expressing a personal opinion, independent of the evidence. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). "[a] prosecutor cannot use his or her position of power and prestige to sway the jury and may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012). A prosecutor enjoys "wide latitude to argue reasonable inferences from the evidence." *Glasmann*, 175 Wn.2d at 704.

> "It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the

17

evidence. Prejudicial error does not occur until such time as it is *clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion*."

*McKenzie*, 157 Wn.2d at 53-54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (emphasis added), *overruled on other grounds*, 47 Wn. App. 232, 734 P.2d 51 (1987)).

In *State v. Armstrong*, 37 Wash. 51, 54, 79 P. 490 (1905), the Supreme Court affirmed the defendant's conviction and found the prosecutor did not err when he stated, "I think you will agree with me that this is the worst homicide that ever occurred in the county." The court reasoned,

> [T]here is a distinction between the individual opinion of the prosecuting attorney, as an independent fact, and an opinion based upon or deduced from the testimony in the case. We think the fair construction of the language used by the prosecuting attorney in this case is that the testimony led him to the conclusion that the appellant was guilty, and that the jury should reach the same conclusion. There was no impropriety in this.

*Armstrong*, 37 Wash. at 54-55.

In *State v. Hoffman*, 116 Wn.2d 51, 94, 804, P.2d 577 (1991), the defendant alleged prosecutorial misconduct when the prosecutor used the phrases: "I think" and "I think the evidence shows." In rejecting the argument and affirming the defendant's convictions, the court said, "We have carefully examined the whole of the prosecutor's argument and conduct in closing argument and conclude that there was no unfair assertion of personal opinions, appeal to the passion or prejudice of the jury or misinformation given to the jury regarding the law." *Hoffman*, 116 Wn.2d at 95.

The situation in *State v. Robinson*, No. 71929-7-I, 2015 WL 5098707, at *7-8 (Wash. Ct. App. Aug. 31, 2015) is analogous to the instant case. In *Robinson*, the defendant argued the prosecutor's use of the words "we know" in closing constituted witness vouching. *Robinson*, 2015 WL 5098707, at *8. Because the prosecutor used the term to marshal evidence already admitted

in trial and the reasonable inferences therefrom, and not for any improper purpose, no prosecutorial misconduct occurred. *Robinson*, 2015 WL 5098707, at *7.

In the present case, like in *Robinson*, the prosecutor used the term "I believe" to marshal evidence already admitted in trial. He tried to convince the jury of "'certain ultimate facts and conclusions to be drawn from the evidence.'" *McKenzie*, 157 Wn.2d at 54 (quoting *Papadopoulos*, 34 Wn. App. at 400). It is not clear and unmistakable that the prosecutor expressed a personal opinion. In part, the prosecutor even argued to the jury using a paraphrase of the defendant's own testimony. The prosecutor argued the evidence and the reasonable inferences therefrom. The prosecutor's argument did not constitute misconduct.

That the majority's reliance on *State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956), is misplaced. In that case, the prosecutor impressed upon the jury his personal belief in the defendant's guilt when he said,

> I doubt that you haven't already made up your mind. Now, you must have, as human beings. But if you haven't, don't hold it against me. I mean, that is my opinion about what this evidence shows and how clearly this evidence indicates that this girl has been violated. I doubt in my mind that anyone at this point has any question in their mind about the guilt or innocence of this man.

*Case*, 49 Wn.2d at 68. Here, the prosecutor's comments are qualitatively different from those in *Case*. Here, the prosecutor did not state his personal opinion about Patterson's guilt. He argued reasonable inferences from the evidence admitted at trial.

It must also be remembered that Patterson did not object to the prosecutor's closing argument. Therefore, the issue is waived unless the misconduct was "'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (quoting *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). Even if the prosecutor's remarks

are considered improper, any error by the prosecutor was not flagrant and ill-intentioned.[2] Nor did the remarks cause any prejudice.

In examining the evidence as a whole, the prosecutor's comments were not prejudicial. Patterson stipulated that he had no right to be at the remote property or on the roof. He stipulated to being guilty of trespass in the second degree. When the new occupant of the house arrived, he saw Patterson on the roof of the house jiggling a window. Patterson scurried from the roof while his companion slid around the side of the house and entered Patterson's truck. Items around the house had been moved. Even though the doors had been locked and closed the previous night, someone tampered with a door so it was no longer latched. Easy access to the interior of the house existed. Patterson's truck was empty.

In examining the evidence, the arguments as a whole, the issues in context, and the jury instructions, I cannot say that the prosecutor's comments were improper, flagrant, or ill-intentioned, or prejudicial to Patterson. I would affirm Patterson's conviction.

_____
Melnick, J.

---

[2] I want to make it clear that prosecutors should avoid using the term, "I believe" in closing argument. Using other terms, *e.g.*, "The evidence shows" or "The State submits the reasonable inferences are," will not give rise to the same issues of prosecutorial misconduct or prosecutorial error, or engender any confusion as to what the prosecutor means.